**STATE of Tennessee, Appellee,**

v.

**Charles W. (Chip) GAYLOR, Appellant.**

Court of Criminal Appeals of Tennessee,
at Knoxville.

Sept. 24, 1992.

Permission to Appeal Denied by
Supreme Court June 7, 1993.

Donald R. Elledge, Clinton, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, John B. Nisbet, III, Asst. Atty. Gen., Nashville, William Paul Phillips, Dist. Atty. Gen., Huntsville, for State of Tenn.

## OPINION

WADE, Judge.

The defendant, Charles W. (Chip) Gaylor, appeals as of right from convictions for first degree murder and conspiracy to commit first degree murder. He was sentenced to life in prison for the murder conviction and to a consecutive term of ten years for conspiracy to commit murder.

In addition to challenging the sufficiency of the evidence, the defendant presents the following issues for review:

(1) whether the trial court properly allowed evidence of the conspiracy into evidence;

(2) whether the trial court properly admitted the defendant's voluntary confession to a prior bad act;

(3) whether the trial court properly refused the defendant's motion for a severance;

(4) whether the trial court properly limited the defendant's cross-examination of a co-defendant;

(5) whether the trial court denied the defendant his constitutional right of due process; and

(6) whether the trial court properly allowed expert medical testimony.

We find no prejudicial error and affirm the judgment of the trial court.

The victim, Hugh Huddleston, drowned on August 14, 1988. The state charged that the defendant planned with others to willfully, deliberately, maliciously, and premeditatedly kill the victim in order to receive benefits from his will, his payroll savings account, and a life insurance policy provided through the victim's employer.

Olen Edward "Eddie" Hutchison, Phillip Varnadore, Richard Miller, William "Bill" Hatmaker (a.k.a. Wilbur Hatmaker), John Lester Rollyson, and Millard C. Curnutt were also indicted on conspiracy and murder charges. The state's theory was that Hutchison had purchased a separate $500,000 life insurance policy on the victim, and solicited the help of the others to drown him. The defendant was tried jointly with Hutchison.[1]

At the time of the victim's death, the offense of conspiracy to take life was found at Tenn.Code Ann. § 39–1–604 (1982). The first degree murder statute provided as follows:

> Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing ... is murder in the first degree.

Tenn.Code Ann. § 39–2–202(a) (1982).

Richard Miller, the chief witness for the state, admitted that he agreed to testify in the "hope it helps me in my case." He described the relationship between the victim and the defendant as like a father and son, at least on the part of the victim. He stated that the defendant did not always return the affection. The victim tried to please the defendant and believed practically anything the defendant told him. Miller testified that he had introduced the defendant to Hutchi-

---

**1.** Hutchison was convicted of first degree murder, conspiracy to commit the murder, and solicitation to commit the murder. The jury imposed the death penalty. The conviction is pending direct appeal to the Supreme Court.

son and that he and the defendant sold drugs for Hutchison.

Miller recalled several discussions between the defendant and Hutchison about life insurance. In the year prior to the victim's death, the defendant often remarked how much money he would get if the victim died. Miller said that the statements were usually made in anger and that he did not take them seriously at the time. Miller overheard Hutchison talk about how much money he could make by acquiring insurance on somebody and then having him killed. In response, the defendant, age 26 at the time of trial, told Hutchison he would give him $100,000 to kill someone he knew but that he could not pay until he received insurance benefits at the age of 30. Hutchison said that was too long to wait. A week later, however, Hutchison directed the defendant to get the victim to sign insurance documents under the guise of a tax write-off. The defendant brought the signed papers back to Hutchison that same evening.

Miller testified that the defendant eventually got the victim to sign a $25,000 promissory note to Hutchison with the insurance policy as security for the debt. Hutchison arranged for a nurse to go to the victim's trailer to administer the physical examination required before the issuance of the policy. He directed the defendant to get the victim to sign some blank checks in order to pay the policy premiums. When a check (made out in black ink except for the victim's signature in blue ink) bounced, Hutchison provided the defendant with enough money to insure that the victim's premium checks would clear. Miller accompanied the victim and the defendant to the bank with the deposit.

Miller said that when all the paperwork was in order, Hutchison offered the defendant money to kill the victim. The defendant declined, saying his motive was too obvious. The defendant originally discussed a fee of $10,000 for killing the victim. Miller, offered $50,000, refused to do so. Later, Phillip Varnadore, one of Hutchison's drug suppliers, agreed to get "his boys" to kill the victim. When Hutchison said that the defendant had informed him that the victim could not swim, Varnadore replied, "Well, that's

how we'll do it." Hutchison told Miller that the victim was to be drowned and that William Hatmaker was going to do it.

On the day before the murder, Miller and Hatmaker went by boat to look at the proposed murder scene. Hatmaker told Miller to have the boat there with the victim on board at the designated time, or that he too would be taken out. The defendant arranged to have the victim go fishing on August 14, 1988.

TBI Agent Ray Presnell testified that he recovered a boat rental agreement from the Old Lindsey Mill Boat Dock dated August 13, 1988. It was signed by Hatmaker.

Tim Huddleston, the victim's nephew, lived with the victim and the victim's mother at the time of the murder. Huddleston answered a phone call for the victim on August 14, 1988, and recognized the voice of the defendant. At the conclusion of the phone conversation, the victim told his nephew that he was going "fishing with the boys."

Later that same day, Miller and the victim rented a pontoon boat and went out on Norris Lake to fish. Miller carried a second, smaller boat to the fishing site. Sometime after dark, Hatmaker and John Rollyson approached them in a separate boat and greeted Miller as if they were friends. Hatmaker and Rollyson boarded the pontoon boat. Shortly thereafter, Miller returned to the marina in his smaller boat "to get bait."

Ted Barton, a marina employee, verified that a man had come to the dock around midnight to buy a dozen minnows. He further recalled that the man (he did not specifically identify Miller) appeared to be in no hurry, purchased some food, and ate before leaving the dock.

Rollyson testified that he knew Hatmaker and Varnadore through drugs deals. Hatmaker had hired Rollyson to beat up people for not paying their debts. In August of 1988, Rollyson was offered $12,500 by Hatmaker to help him kill someone. On the day of the murder, Rollyson and Hatmaker borrowed a boat and went to Norris Lake. On the way out to Miller's boat, Hatmaker told Rollyson that "this man can't swim so we're going to take care of him this way."

Rollyson said that after Miller left for the marina, Hatmaker pushed the victim into the water. As the victim was drowning, Hatmaker took a rag, wiped the boat off, and said, "Let's get the hell out of here!" Hatmaker then told Rollyson that the murder was an insurance deal and that he would be paid his $12,500 within 90 days.

Between midnight and 1:00 A.M., Miller returned to the pontoon boat. When he found that the victim was missing, he went to the Old Lindsey Mill Boat Dock to call the police.

The victim's body was found in 15 feet of water. The medical examiner determined that the victim had drowned. Although he did not initially observe any signs of violence, a deep bruise was later discovered in the scalp near the right ear. Initially, the drowning was deemed accidental.

Dr. Cleland Blake testified that the bruise was caused by a blunt surface. The injury was consistent with the victim striking his head on the pontoon boat but also consistent with having been inflicted by the flat surface of a paddle. Dr. Blake could not determine when the injury occurred. There were no drugs or alcohol found in the victim's system.

The defendant was the beneficiary of both an insurance policy and a payroll savings account with the victim's employer. He was also entitled to the victim's accrued wages. His total death benefit was $289,739 plus interest. The victim had also made a will in 1984 in which he made the defendant his sole beneficiary. The defendant was to get five percent outright upon the victim's death. The remainder was to be held in trust with the defendant's grandmother as trustee. One-half of the estate was to be distributed when the defendant reached the age of 25 with the balance due at age 30. The defendant was 19 years old when the will was made.

The victim's employer sent the defendant $2,722.50, representing the balance in the savings account. On September 27, 1988, the defendant filed a claim on the insurance proceeds but never received either the death benefit or the victim's accumulated earnings.

Charles Ray Boruff, on military duty in Saudi Arabia at the time of trial, provided a deposition. He stated that in August of 1987, Hutchison asked him to witness the victim's signature on a $25,000 promissory note. The victim was not present and Boruff saw no money change hands. The defendant's signature was already on the note. The signature of Millard C. Curnutt, the agent responsible for the insurance policy, was on the note at the time of trial; Boruff stated that Curnutt's signature was not on the note when he signed. Boruff also testified that Hutchison told him to say that he had seen Hutchison loan the victim the $25,000 if he was ever asked.

The benefits administrator at the victim's place of employment stated that she had heard the victim had money problems. There were garnishments of his wages during 1987 and 1988.

An insurance executive of United Insurance Company of America testified that a $500,000 accidental death policy on the life of the victim was signed on August 12, 1987. It named Hutchison as the sole beneficiary. Hutchison filed a claim on the policy but did not receive any death benefit. Curnutt, he said, was the agent responsible for the policy.

A district manager testified that Curnutt had insisted that the policy provide accidental death coverage. He stated that Curnutt personally delivered the quarterly premium payments to the district office in Knoxville.

Keith Wilson, a cell mate with Hutchison at the Scott County Jail, testified that Hutchison told him that the others involved in the plot to kill the victim knew better than to say anything to the authorities. Otherwise, they would end up like the victim. Hutchison told Wilson that if everybody kept quiet, the state could not prove anything.

Various witnesses testified that while the victim had remained dedicated to the defendant during the year or so before his death, Miller had become increasingly close to the victim. Miller bragged that he could get money from the victim whenever he pleased. He often used the victim's motor vehicles.

The defendant testified that he was camping with his father on the day of the murder

and could not have called the victim because he had no access to a phone. He denied any involvement in a conspiracy to take the victim's life. Miller's former girlfriend testified for the defense. She said that Miller was untruthful.

Hutchison denied that he was involved in drug trafficking. He admitted that he had met the defendant through Miller, but denied that they had sold drugs for him or that the defendant had ever asked him to have someone killed. Hutchison claimed that he had loaned the victim money on 35 to 40 separate occasions beginning in 1985. The promissory note was to document a loan for $25,000. Hutchison testified that at the time the note was executed, the defendant, Boruff, and Curnutt were present and signed as witnesses. Hutchison denied that he arranged for the insurance policy and the physical. He contended that the victim was solely responsible for buying the insurance policy as a means of securing the loan.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). A jury verdict accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The defendant asserts that Miller, an accomplice in the scheme, was the only witness who connected the defendant to the offense. Without independent corroboration of his testimony, the conviction cannot stand.

An accomplice is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of the crime. *Clapp v. State,* 94 Tenn. 186, 30 S.W. 214, 216 (1895). A defendant cannot be convicted upon the uncorroborated testimony of an accomplice. *Monts v. State,* 214 Tenn. 171, 379 S.W.2d 34 (1964). Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as trier of fact. *Stanley v. State,* 189 Tenn. 110, 222 S.W.2d 384 (1949).

In *Hawkins v. State,* 4 Tenn.Crim.App. 121, 469 S.W.2d 515 (1971), this court discussed the nature of the rule:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

4 Tenn.Crim.App. at 133–34, 469 S.W.2d at 520 (citations omitted); *See also Marshall v. State,* 497 S.W.2d 761 (Tenn.Crim.App.1973).

Indeed, only three of the non-accomplice witnesses for the state made reference to or knew of the defendant. Yet Boruff disputed the defendant's claim that there was a meeting at the Hutchison residence at the time the promissory note was signed. In fact, Boruff said he neither knew the defendant nor saw Hutchison loan the victim the $25,000. Boruff did testify that the defendant's signature was already on the note at the time he signed it.

Other witnesses testified that the victim would have done just about anything the defendant asked, such as sign papers without question. The will, the insurance policy, and

employment records established the defendant as the primary beneficiary of the victim's estate. His motive to participate in the crimes was apparent. Because of his close relationship with the victim, the defendant was in a position to know that the victim could not swim. The victim's nephew testified that the defendant talked to the victim on the day of the murder and asked him to go on a fishing trip. The victim drowned only hours later. The benefits administrator at the victim's employment testified that the defendant and Miller had come jointly to the victim's place of employment on a payday.

We hold that the corroborative evidence was sufficient to support an inference that the defendant helped plan the victim's murder. When coupled with Miller's testimony, the evidence was sufficient to convict.

I

The defendant argues that the trial court incorrectly allowed hearsay testimony before the court determined whether there was a conspiracy and that the statements should have been excluded because they were not made in the course of and in furtherance of the conspiracy.

■ Tenn.R.Evid. 803(1.2)(E) permits statements offered against a party that are statements "by a co-conspirator of a party during the course of and in furtherance of the conspiracy." A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. *State v. Lequire*, 634 S.W.2d 608, 612 (Tenn.Crim.App. 1981). In this case, the state's theory was that the defendant, Hutchison and others conspired to kill the victim to collect on insurance policies on the victim's life. The defendant also stood to benefit from both the victim's will and certain employment-related assets.

■ In order to prove a conspiracy, it is not necessary that the state show a formal agreement between the parties to do the unlawful act; a mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement. The unlawful confederation may be estab-

lished by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprises. *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn.Crim.App.1978).

The defendant asked the trial court to first determine whether a conspiracy existed before allowing the testimony of Richard Miller. The motion was denied. Miller testified that the defendant told Hutchison that he wanted someone killed and that he would pay $100,000 as soon as the estate was settled. He also made reference to the statements of William Hatmaker describing how the victim died ("didn't make a peep"). John Rollyson testified as to statements made by Hatmaker in December 1989 regarding Hutchison's arrest.

■ Declarations of co-conspirators which would otherwise be inadmissible as hearsay may be offered as proof when certain conditions are met: (1) the declaration was made in furtherance of the conspiracy; (2) it was made during the pendency of the conspiracy; and (3) there is independent proof of the existence of the conspiracy and the connection of the declarant and the defendant to it. *State v. Wiseman*, 643 S.W.2d 354, 365 (Tenn.Crim.App.1982); *State v. Hodgkinson*, 778 S.W.2d 54 (Tenn.Crim.App. 1989). Although the test requires the state to establish a *prima facie* case of conspiracy, the trial court has the discretion to permit evidence to be given at any time pending a later showing of admissibility. *Soloman v. State*, 168 Tenn. 180, 76 S.W.2d 331 (1934).

■ Tenn.R.Evid. 803(1.2)(E) does not require the trial court to determine that a conspiracy existed before allowing a co-conspirator's statements into evidence. *See* N. Cohen, D. Paine, and S. Sheppeard, *Tennessee Law of Evidence*, § 803(1.2) (2d ed. 1990). Moreover, Tenn.R.Evid. 104(b) permits the trial court to allow the introduction of proof subject to the subsequent introduction of evidence which would make it relevant. Thus, while some initial proof of a conspiracy is required before the introduction of a co-conspirator's declarations, the trial judge may permit the declaration conditioned on the fact that a conspiracy will later be established by additional evidence.

The defendant also argues that this testimony should have been excluded because it involved declarations made outside of the time (August of 1987 through August of 1988) the indictment alleged that the conspiracy took place. He argues the statements were neither in the course of nor in furtherance of a conspiracy and were, therefore, inadmissible as hearsay.

■ The applicable rule requires that the conspiracy must have been in process at the time the statement was made. Tenn.R.Evid. 803(1.2)(E). If the conspiracy either had not yet begun or had ended by the time the statement was made, the declaration is not admissible under the hearsay exception. *Owens v. State*, 84 Tenn. 1 (1885); *Sweat v. Rogers*, 53 Tenn. 117 (1871).

■ As to Miller's initial testimony, the conversations he described appear to have taken place at the beginning of the conspiracy. Further, they would qualify as admissions under Tenn.R.Evid. 803(1.2). Thus, they were admissible. Miller testified that within a week of the defendant's statement to Hutchison that he wanted someone killed, Hutchison instructed the defendant to take the insurance papers to the victim for signing. The other statements were, in our view, part of an ongoing effort to conceal the conspiracy [the insurance proceeds, the goal of the conspiracy, had not yet been collected].

We therefore hold that the statements were admissible, as made during the pendency of the conspiracy and in furtherance of it. There was adequate proof of the existence of a conspiracy and the connection of the defendant and the declarants to it.

## II

The defendant argues that the trial court improperly allowed the defendant to be cross-examined about prior bad acts because the state had not complied with the notice requirements stated in Tenn.R.Evid. 608 and 609.

The trial court ruled that the state could question the defendant concerning the drug relationship between the defendant and Hutchison even though the state had not filed a notice as provided by the rules. It further held as follows:

> But you can't go out here on some kind of drug somewhere else, smoking pot with somebody else, has got nothing to do with this case. You can't ask that. That's a prior bad act. That's what I'm ruling, trying to rule.

On cross-examination of the defendant, the following exchange took place:

Q. [Y]ou placed a lot of calls to the number 435–4879, didn't you. That's Larry and Teresa Daugherty, from Hugh's [the victim's] phone.

A. I know Larry and Teresa Daugherty.

Q. Tell the jury what you'd talk about with the Daugherty's on Hugh's phone.

A. Ah, I've been ... to parties ... and at one time I had bought some pot from them.

Q. Yes, sir, and you also bought some pot from someone named Jamie, didn't you. [Objection and bench conference]

The district attorney general claimed that he had not anticipated that the defendant would admit his purchase of drugs in response to the question. The state submits that this was the only prior bad act that came into evidence and that the defendant's admission was not the expected answer.

■ Tenn.R.Evid. 608(b)(3) requires that the defendant must be given reasonable written notice of the impeaching conduct before trial. The prosecution must notify the defendant that the prosecution intends to use the conduct to impeach the accused's credibility. The trial judge must rule on the admissibility of such proof either prior to the trial or, in any event, prior to the testimony of the defendant.

■ The evidence of a prior bad act is admissible only if the probative value of the impeaching evidence outweighs the unfair prejudicial effect on the substantive issues. The state contends that the question (which the defendant answered) does not fall within the purview of Tenn.R.Evid. 608 because the district attorney general was not asking the defendant about specific instances of conduct; he simply inquired about the nature of his

discussions with the Daughertys. It argues that the defendant voluntarily confessed to the prior bad act. The state concedes that the district attorney general's second question was improper, but submits that the error was harmless. *See* Tenn.R.App.P. 36(b).

When the defendant took the stand, he knew that he would be subjected to questions about drugs in regard to his relationship with Hutchison. The trial court, however, prohibited questions about his drug involvement with other parties. When the prosecutor asked the question, he knew that if the defendant answered truthfully, he would have to admit a prior bad act. The question was in violation of the trial court's initial ruling. The trial court permitted the response, however, on the basis that the Daugherty transaction was somehow connected to the defendant's relationship with Hutchison.

In our view, the objection should have been sustained and curative instructions given. Despite the error, however, legitimate testimony about both drug dealing and usage appears throughout this two thousand plus page record. The prosecution never sought an answer to its second question. In fact; when cross-examination resumed, the state, at the urging of the trial court, went to a different subject. Considering the record as a whole, we find the state's error was harmless. Tenn.R.App.P. 36(b). In context, we do not believe the error occasioned by the question and answer affected the outcome of the trial or caused prejudice to the judicial process.

### III

Before trial, the state sought to consolidate the defendant's case with Hutchison's so that they could be tried separately from Hatmaker, Miller, Varnadore, Rollyson, and Curnutt. *See* Tenn.R.Crim.P. 13(a). The others had allegedly made statements that inculpated the defendant. The defendant argues that the trial court's grant of the state's motion was erroneous.

Rule 13(a) of the Tennessee Rules of Criminal Procedure provides that the court "may order consolidation of two or more indict-ments, presentments, or informations for trial if the offenses and all defendants could have joined in a single indictment, presentment, or information pursuant to Rule 8." Rule 8(c) states that "two or more defendants may be joined in the same indictment, presentment, or information: (1) if each of the defendants is charged with accountability for each offense included; or (2) if each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy."

Here, the trial court found no basis to try the defendants separately. In fact, Hutchison, who was also charged with solicitation to commit murder, was otherwise charged with the same crimes as defendant, i.e., first degree murder and conspiracy to commit first degree murder.

In our view, separate trials were unnecessary. The record demonstrates that the guilt of innocence of each defendant could be fairly determined. The trial court properly instructed the jury on that point. *State v. Kyger*, 787 S.W.2d 13 (Tenn.Crim.App.1989). The jury is presumed to have followed the instructions. *State v. Newsome*, 744 S.W.2d 911, 915 (Tenn.Crim.App.1987). Absent a showing of prejudice, a reviewing court may not overturn the trial court's exercise of discretion on the issue of severance. *State v. Coleman*, 619 S.W.2d 112, 116 (Tenn.1981); *State v. Hopper*, 695 S.W.2d 530 (Tenn.Crim. App.1985). We find none.

### IV

The defendant argues that the trial court improperly limited cross-examination. After Varnadore refused to answer certain questions and invoked the fifth amendment, the court ruled that the defense could not ask questions outside the scope of the direct examination.

Tenn.R.Evid. 611(b) provides that a witness "may be cross-examined on any matter relevant to any issue in the case, including credibility...." On the other hand, Tenn.R.Evid. 501 states that "[e]xcept as otherwise provided by constitution, ... no person has a privilege to ... (2) refuse to dis-

close any matter...." This rule permits a witness to refuse to disclose any matter upon assertion of the right against self-incrimination.

It is the prerogative of the trial court to determine whether a witness has properly invoked his fifth amendment right against self-incrimination. *State v. Stapleton,* 638 S.W.2d 850, 855 (Tenn.Crim.App. 1982). While the right of cross-examination is fundamental, its exercise is controlled by the discretionary authority of the trial judge. *Davis v. State,* 186 Tenn. 545, 212 S.W.2d 374 (1948); *Hobbs v. State,* 3 Tenn.Crim.App. 238, 460 S.W.2d 377 (1970). Only a plain abuse of that authority constitutes grounds for reversal. *State v. Fowler,* 213 Tenn. 239, 373 S.W.2d 460 (1963); *State v. Black,* 618 S.W.2d 526, 528 (Tenn.Crim.App.1981). We have reviewed the record carefully. It does not appear that the cross-examination was restricted except as to those matters to which the witness claimed privilege. Consequently, we find no error.

V

The defendant argues that the conduct of the trial was prejudiced toward the defendant and violated his right to due process. The record does not, however, support this allegation. Moreover, the defendant has waived this issue by failing to cite authorities in support of his argument. Ct.Crim.App.R. 10; *State v. Lunati,* 665 S.W.2d 739 (Tenn. Crim.App.1983); Tenn.R.App.P. 27(a)(7).

VI

Over the objection of defense counsel, Dr. Cleland Blake testified about the physiology of a drowning. The defendant argues that this expert testimony (1) contained no probative value, (2) was unfairly prejudicial, and (3) was cumulative. The state asserts that the testimony was relevant as to the issues of malice and premeditation.

Dr. Blake testified, in part, as follows: [I]f the person comes into the water say in the night where there's nothing he can reach to, he goes under the water, he is disoriented, he does not know where the surface is, the bottom of the water is, he doesn't know right from left. He is just suspended like an astronaut in space. He's in the water and he can turn over and over and not know which direction is which. He will reach to grab something which is not there. The first response of the body physiologically, meaning as to what's going to happen, has to do with the panic reaction when he gets a little bit of water in his lungs. The lungs in fresh water drowning do not completely fill with water, they never fill with water because all the air would have to be pushed out and the person in the drowning situation can't do that. They can't push all the air out and suck in all water to replace it. So at that first panic reaction when they gasp—choke, if you will—closes off the larynx like you can close off your air passages, that's what happens in a drowning person. The vocal chords and the larynx go into spasm, they completely [con]strict off, minimal water gets in the lungs.... The water that is in the lungs, the fluid that causes the increase in the weight, is not the water from the lake. It's the water from the pumping of the heart pushing blood for the next few minutes until the heart stops, namely 3, 3½, 4 minutes at the outside, but the person already has blacked out, is unconscious within 30 seconds to 1 minute without getting oxygen but the heart keeps pumping. The lungs are not breathing so the heart pumps, ... the total heart's pumping but the right ventricle is sending blood to the lungs but it can't circulate and come back. It pushes fluid out into the lung cavities, like water in the lungs, fluid in the lungs, called pulmonary edema medically. This is foamy pulmonary edema that pours out into the air sacks. That's not lake water.

\* \* \* \* \* \*

Panic and fright reaction, struggling, trying to reach for something. Thirty seconds to one minute the person blacks out; that is, if they don't get head to the surface and get a gasp of air....

\* \* \* \* \* \*

For that short period it's a horrible, agonizing, almost as if someone could shut off

your air and put a hand or a pillow over you. It's utter panic reaction.

Relevant evidence is that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn.R.Evid. 401. Rule 403 allows for the exclusion of evidence if the "probative value is substantially outweighed by the danger of unfair prejudice...." Rule 702 allows an expert to state his opinion on a relevant issue if the information "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue...."

The trial judge has broad discretion in determining the admissibility of expert testimony. *Baggett v. State*, 220 Tenn. 592, 598, 421 S.W.2d 629, 632 (1967). Malice and premeditation were elements of the offense. The physician's testimony only marginally relates to malice. The more likely purpose of the testimony was to dramatize the death of the victim. It's practically impossible for a jury not to empathize with the victim in the face of such testimony. The tendency of this type of evidence is as much to arouse the passions of the fact-finders as to present probative evidence of guilt. Yet the testimony provided a general explanation of how a drowning death occurs. It was based upon reasonable medical authority and touched upon an element of the offense. Because there was plainly other evidence establishing both malice and premeditation, the physician's testimony, in context, was not particularly harmful and did not unduly prejudice the trial.

Accordingly, the judgment is affirmed.

DWYER and PEAY, JJ., concur.