# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 13, 2011 Session

## STATE OF TENNESSEE v. JAMAR ED-WAE SCOTT

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-A-419      Seth Norman, Judge**

---

**No. M2010-00809-CCA-R3-CD - Filed December 15, 2011**

---

A Davidson County Criminal Court jury convicted the appellant, Jamar Ed-Wae Scott, of two counts of first degree felony murder, two counts of second degree murder, and two counts of attempted robbery, and the trial court sentenced him to an effective sentence of life plus eight years in confinement. On appeal, the appellant contends that (1) the trial court erred by allowing a witness to testify about a statement made by a co-defendant pursuant to Tennessee Rule of Evidence 803(1.2)(E), the co-conspirator exception to the hearsay rule, and (2) the evidence is insufficient to support the convictions. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Paula Blair (on appeal) and Michelle H. Thompson and Derrick Scretchen (at trial), Nashville, Tennessee, for the appellant, Jamar Ed-Wae Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm and Renee Erb, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

The record reflects that in January 2006, the Davidson Grand Jury jointly indicted the appellant and Francine Goss for two counts of first degree felony murder committed during

the perpetration of attempted robbery, two counts of first degree premeditated murder, and two counts of attempted robbery. The charges resulted from the shooting deaths of Gregory Miles and Andrea[1] McFee on September 11, 2005. The appellant was tried separately from his co-defendant, and his first trial resulted in a mistrial because the jury was unable to reach a verdict.

At the appellant's second trial, Kemur Bryant testified that in 2005, he was dating Tymarea Lacy, who lived on Joseph Avenue in Nashville. Lacy and the appellant were friends, and Bryant knew the appellant as "Kool-Aid." At some point, Bryant, Lacy, and the appellant were in Lacy's bedroom. Bryant said that he was sitting on Lacy's bed with his "head down" and that the appellant told Lacy, "I shot two people." The appellant also told Lacy that his cousin, David, was with him at the time of the shootings; that the motive was robbery; and that the appellant's girlfriend set up the robbery. Bryant did not contact the police at that time. A couple of months later, Bryant saw the appellant at Lacy's home again, and the appellant had a bus ticket stub from Cleveland, Ohio. Bryant went to the police department, told the police that the appellant claimed to have shot two people, and told the police that they could find the appellant at Lacy's house. Later, Bryant heard the appellant threaten him over the telephone for turning the appellant in to police.

On cross-examination, Bryant acknowledged that he testified at the appellant's preliminary hearing and the appellant's first trial. He said he did not remember if he ever testified previously that someone was with the appellant at the time of the shootings. He said that the first trial was "a year ago" and that "I don't remember half the stuff at that trial last year." The appellant's conversation with Lacy lasted thirty to forty-five minutes, and Bryant did not say anything during the conversation. The conversation occurred sometime in 2005, but Bryant did not remember the month. He said that he had only known the appellant for a couple of months at the time of the conversation and that he had never had a confrontation with the appellant. He denied that he was "bothered" by Lacy's relationship with the appellant. As to the appellant's threat, Bryant said that he recognized the appellant's voice over the telephone and that the appellant never threatened him directly.

Twenty-three-year-old Tymarea Lacy testified that she had known the appellant since they were young and that his nickname was Kool-Aid. In 2005, Lacy was dating Kemur Bryant. Regarding her conversation with the appellant in her bedroom, she said, "The only thing that I remember him saying is that he was at the shooting but he don't know if he shot anybody or not." She said that she knew someone named David but that she did not remember if the appellant said David was with him at the time of the shootings. She said that she did not know if the appellant said anything about a robbery and that "[h]e just said that

---

[1]The victim's name is spelled "Andre" in the autopsy report.

he was shooting." After Lacy's conversation with the appellant, the appellant went to Ohio to visit his aunt. When he returned to Nashville, he visited Lacy's home. Lacy did not contact the police but was with the appellant in her house when the police arrived and surrounded it. She and her family went outside, but the appellant remained in the house. She acknowledged that she gave an audiotaped statement to someone in the district attorney's office and that she told the person the appellant said he shot two people "last night." She said she was supposed to testify against the appellant previously but that she "didn't want to come." She said that having to testify against the appellant had caused her to be stressed and attempt suicide.

On cross-examination, Lacy acknowledged that her audiotaped statement was similar to her direct examination testimony. She said she did not remember what month her conversation with the appellant occurred. The appellant did not tell her where the shooting took place or if someone was with him.

Lonnie Anderson testified that in 2005, she lived on Jenkins Street and knew the appellant as Kool-Aid. Francine Goss lived on the corner of Salem Mason Drive and Aspen Drive. About 2:30 a.m. on September 11, Anderson left home with a friend and went to the store to buy beer. Then she went to a house at 2700 Aspen Drive. Anderson said that she arrived at the home about 2:45 or 3:00 a.m. and that she was sure of the time because beer was not sold after 3:00 a.m. in Davidson County. When she got to the house on Aspen Drive, she saw the appellant in his car parked across the street. Anderson got out of her car and looked at the appellant; the appellant looked at her. She said that someone was with the appellant but that she did not know the person. She also said, "I really did not know Mr. Scott, I just seen him from the neighborhood." Anderson went into the house and shut the door. About 4:00 or 4:30 a.m., she was watching the news on television and learned two people had been killed on Aspen Drive. She said she opened the door and saw "about fifty police cars." Anderson said she had heard gunshots earlier but that she thought they came from a nearby area known as "Dodge City." Sometime after the shootings, Anderson saw the appellant again. He asked her what time she had seen him on September 11. She said she told him, "[I]t was about 2:30 [a.m.]." The appellant disagreed with her and told her that she had seen him at 1:30 a.m. She stated, "I just said, okay, and just went on, you know. He thought it was 1:30. I knew it was 2:30, quarter to 3:00. I knew what time where I was."

On cross-examination, Anderson testified that she wore prescription glasses. She acknowledged testifying at the appellant's preliminary hearing that "[w]e had to pass each other; I went in the drive and he was sitting [in] the car." She explained at trial that "for me to get in the driveway I had to pass by his car to turn in the driveway." She said that she was intoxicated by 7:00 p.m. the evening before the shootings but that "it don't stop me from seeing." She said she did not know what time she learned about the shootings from the news

but that it was "whatever time the news came on." She acknowledged having a 2003 theft conviction.

Daphane Harvey testified that in September 2005, she had known Francine Goss for "some months" and that their daughters went to school together. Goss lived on Aspen Drive, which was behind Harvey's house on Jenkins Court, and Harvey could see Goss's house from Harvey's back door. On the night of September 10, Harvey's daughter spent the night with Goss's daughter at Goss's home. Sometime after midnight, Goss walked to Harvey's house and asked to use the telephone. Harvey wanted to go to the store to buy alcohol. She said she and Goss drove to "the bootleg house to get some liquor." She said that when they "first started riding," Goss told her that Goss "wanted to get somebody." Harvey understood Goss to mean that Goss was going to rob someone. Harvey said she told Goss that she "wasn't with that shit," meaning Harvey would not participate in the robbery. Earlier, Goss had told Harvey that Goss needed money for her house.

Harvey testified that she and Goss arrived at the bootleg house about 3:00 a.m. and bought gin or vodka. Then they drove around, looking for cocaine. They stopped at Paul's Market, and Harvey went inside. She said she knew they arrived at Paul's Market just before 3:00 a.m. because the store closed at that time. Harvey bought beer, cigarettes, and chicken. While she was in the store, Goss remained outside. When Harvey went outside, Goss was talking with the victims, two young men, who were sitting in a white car. Harvey and Goss drove to Goss's house, and the victims followed them.

Harvey testified that the four of them went into Goss's house and drank alcohol. Five children, including Harvey's and Goss's daughters, were sleeping in the back of the house. Harvey asked the victims their names. She said that one of the victims said his name was "D" and that the other said his name was "[B]utter." She said that she asked why he was called "Butter" and that he told her it was because he had "a butter," meaning cocaine. He showed her some cocaine, and she bought ten dollars worth from him. Harvey drove back to her house and walked to a neighbor's house to use the drug. She said that while she was "getting high," she heard gunshots. However, she thought the gunshots came from the area known as Dodge City. She said that the shots occurred about one hour after she left Goss's home. Later, she saw blue lights outside and returned to Goss's house. Harvey's daughter and the other children were standing on the sidewalk, and Harvey took them to her home. Harvey spoke with the police three times after the shootings. She said that sometime between September 11 and December 26, 2005, the appellant came to her home and told her that "I needed to quite running off my M-F gums; that . . . if he go to jail to do two counts of 51 to life, he was going to send the store to buy everybody in my family a black suit." Harvey understood the appellant to be making a death threat.

On cross-examination, Harvey testified that she never saw the appellant on the night of the shootings and that she never heard Goss talk to the appellant. She acknowledged that although Goss came to her home to use the telephone, Goss had a cellular telephone. She also acknowledged that she previously had testified that she did not remember how much time elapsed between her leaving Goss's house to use the cocaine and hearing the gunshots. The defense asked, "How would you explain to this jury the fact that . . . now you have a firm memory that you believe it was one hour later you heard these gunshots?" Harvey answered, "I don't know."

Sixteen-year-old Jamilia Harvey, who was thirteen years old at the time of the shootings, testified that she and Goss's daughter, Kira, were friends. On the afternoon of September 10, 2005, Jamilia[2] was playing at Goss's house. Jamilia said that at some point, Goss told her that Goss was "going to do a robbery." As it was getting dark, the appellant and someone named Little David arrived. Jamilia saw a gun in the appellant's waistband, and the gun was silver with a black handle. Jamilia stated that sometime after the appellant and Little David arrived, Goss "said something about her house" and told the children again that she was going to do a robbery. Goss also told them not to go to sleep. Goss gave Kira a key to the shed and was supposed to give the children a signal. When the children received the signal, they were to go to the shed and stay there until the police arrived. Jamilia said that the appellant and Little David left with "a bunch of boys" and that she did not see them again.

Jamilia testified that Goss never gave them a signal and that she and the other children went to sleep. At some point, Goss's sister woke them and told them to go to the shed. As the children walked by the living room, Jamilia saw two men sitting on the couch. They appeared to be sleeping, and Goss was sitting by the front door, crying. Jamilia said that "[i]t was like getting to be morning time" and that she and the other children waited in the shed until the police arrived.

On cross-examination, Jamilia testified that she never saw the appellant converse with Goss on September 10. The appellant was not at the house when Goss said she was going to rob someone.

Sergeant David Slessinger of the Metropolitan Nashville Police Department testified that he investigated the shootings. On January 4, 2006, he received information that the appellant was in a residence. Sergeant Slessinger and five or six officers went to the home, and Sergeant Slessinger walked to the back of the house. He saw a male matching the

---

[2]Because the witness and her mother, Daphne Harvey, share a surname, we will refer to her by her first name.

appellant's description exit through the back door. The male saw the officers and went back inside the house. A negotiating team arrived and began negotiating with the appellant. Later, a SWAT team arrived and arrested him. On cross-examination, Sergeant Slessinger testified that he and the other officers went to the home to arrest the appellant for outstanding warrants.

Sergeant Jason Proctor of the Metropolitan Nashville Police Department testified that on September 11, 2005, he responded to a 911 call made by Goss from her cellular telephone. The victims had been removed from the scene. Sergeant Proctor inspected Goss's cellular telephone and wrote down recent calls made to and from the phone.

Detective Christopher Brennan of the Metropolitan Nashville Police Department testified that he took photographs and collected evidence from Goss's home. Bloodstains were on the front and back of the living room couch. Detective Brennan found a spent nine millimeter cartridge case on a chair cushion in the living room, and a bullet was on the floor behind the chair. A bullet hole was in the chair and in the west wall of the living room. Detective Brennan collected a nine millimeter unfired cartridge from the living room floor and a .22 caliber unfired cartridge near the front door. He found a .22 caliber spent cartridge case outside. The cartridge case was on top of some leaves beside the front porch.

On cross-examination, Detective Brennan testified that he did not collect fingerprints from the scene because Goss told officers that the victims were not present long enough to leave prints. Detective Brennan did not search the residence beyond the living room area. He found a subwoofer speaker box on the sidewalk and a similar box inside the victims' car. He acknowledged that a "shootout" occurred in Goss's home.

Steve Scott of the Tennessee Bureau of Investigation (TBI) testified as a firearm identification expert that he examined the evidence collected in this case. The bullet recovered from inside Goss's home was a .38 caliber or .357 caliber magnum projectile. The four bullets recovered from the victims also were .38 caliber or .357 caliber magnum projectiles. Scott examined all five bullets microscopically and concluded they were fired from the same gun. He said that he also inspected the nine millimeter spent cartridge case and the nine millimeter unfired cartridge and determined that they had "at one time been cycled through the same firearm." Finally, Scott microscopically examined the .22 caliber spent cartridge case collected beside the porch and the .22 caliber unfired cartridge collected near the front door. However, he was unable to determine whether they had been cycled through one weapon or multiple weapons.

On cross-examination, Scott testified that two nine millimeter guns and two .22 caliber guns could have been used during the shootings. He acknowledged that three to five

guns were used during the incident.

Stacy Turner, a medical examiner for Davidson County, testified that Dr. Bruce Levy performed the victims' autopsies. Although Dr. Levy was unavailable to testify at trial, Dr. Turner testified from his reports. According to the reports, twenty-two-year-old Gregory Miles died from three gunshot wounds to the torso. The bullets damaged his liver, stomach, left kidney, intestines, spinal cord, and major blood vessels. Dr. Levy recovered three bullets from Miles's body. His cause of death was multiple gunshot wounds, and his manner of death was homicide. Twenty-one-year-old Andrea McFee died of two gunshot wounds to the torso. Dr. Levy recovered one bullet, and the victim's manner of death also was homicide.

Detective Danny Satterfield of the Metropolitan Nashville Police Department testified that he arrived at the scene between 4:30 a.m. and 5:00 a.m. Other officers were already present, and one victim had been removed from the scene. Goss also was present but was not a suspect at that time. Detective Satterfield interviewed Daphane Harvey that morning and learned of a possible suspect, Kool-Aid, who was Goss's boyfriend or ex-boyfriend. Detective Satterfield talked with Harvey again on September 13 and 26. After speaking with Harvey the third time, Goss became a suspect.

Detective Satterfield testified that he obtained the appellant's cellular telephone records for September 1 to September 15, 2005. He determined that Goss also had been using a cellular telephone and inspected the appellant's phone records for calls between the appellant and Goss during that time period. On September 1, 2005, Goss telephoned the appellant twice for one minute each time. Between September 2 and September 9, there were no calls between them. On September 10, Goss telephoned the appellant at 11:05 p.m. The call lasted one minute. The appellant telephoned Goss at 11:31 p.m., and the call lasted three minutes.[3] Between 1:02 a.m. and 2:27 a.m., nine calls were made between the appellant and Goss. One call lasted three minutes, one call lasted two minutes, and the remaining calls lasted one minute. Between 2:32 a.m. and 4:38 a.m., the appellant and Goss exchanged twenty-eight calls. Most of the calls lasted one minute, but one call lasted four minutes. The appellant and Goss called each other thirteen times between 4:59 a.m. and 9:17 a.m.; four times between 10:10 a.m. and 7:22 p.m.; and twice between 7:42 p.m. and 10:17 p.m. The appellant and Goss exchanged two calls on September 12, two calls on September 13, and two calls on September 15.

On cross-examination, Detective Satterfield testified that the shootings occurred

_____

[3]According to our review of the appellant's telephone records, the appellant also telephoned Goss at 11:07 p.m. The call lasted one minute.

sometime after 4:00 a.m. on September 11. Although Sergeant Proctor wrote down telephone numbers made from Goss's cellular telephone, Detective Satterfield did not investigate any of the numbers. He also did not investigate Fred Laster, Goss's former boyfriend, who had a prior conviction for aggravated robbery. Detective Satterfield stated that he tried to interview Laster but that Laster was uncooperative. Detective Satterfield did not interview Dedrick Phelps, another of Goss's ex-boyfriends. Detective Satterfield interviewed Lonnie Anderson on September 27, 2005. He acknowledged that she told him she saw the appellant about 4:00 a.m. on September 11. Gunshot residue tests were not performed on the victims' hands.

On redirect examination, Detective Satterfield testified that gunshot residue tests were not performed in Davidson County because they were not reliable. He acknowledged that on the morning of the shootings, Goss was treated as a victim, not a suspect.

The defense presented no proof. The jury convicted the appellant of two counts of felony murder committed during the perpetration of attempted robbery; two counts of second degree murder, a Class A felony, as a lesser-included offense of first degree premeditated murder; and two counts of attempted robbery, a Class D felony. The trial court merged the second degree murder convictions into the first degree murder convictions and sentenced the appellant to concurrent life terms. The trial court sentenced the appellant to consecutive four-year sentences for each of the attempted robbery convictions and ordered that they be served consecutively to the life sentences for a total effective sentence of life plus eight years in confinement.

## II. Analysis

### A. Co-defendant's Statement

The appellant contends that the trial court erred by allowing Harvey to testify about a statement made by Goss pursuant to Tennessee Rule of Evidence 803(1.2)(E), the co-conspirator exception to the hearsay rule. Specifically, the appellant contends that Harvey should not have been allowed to testify that Goss said she wanted to "get somebody" because there was no proof that a conspiracy existed between Goss and the appellant when Goss made the statement. The State contends that the trial court properly allowed Harvey to testify about the statement. We agree with the State.

The State's theory of the case was that Goss and the appellant conspired to rob the victims and that Goss was to lure the victims to her house where the appellant would rob them. Just before Harvey took the stand to testify for the State, the prosecution informed the trial court that Harvey would be testifying about "the conversation she had with Francine

-8-

Goss that evening about getting someone." The State argued that Harvey's testimony was admissible because Kemur Bryant had testified that he heard the appellant say the appellant's girlfriend set up the robbery. The trial court, concluding that Bryant's testimony established proof of a conspiracy, ruled Harvey's testimony was admissible. Harvey testified that sometime after midnight on September 11, Goss came to her house and asked to use the telephone. She stated that about 3:00 a.m., they drove to "the bootleg house to get some liquor." Harvey said that during the drive, Goss told her that Goss "wanted to get somebody." Harvey understood Goss to mean that Goss was going to rob someone.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. Tennessee Rules Evidence 803(1.2)(E) provides that a hearsay statement is allowed against a party when made "by a co-conspirator of a party during the course of and in furtherance of the conspiracy." As explained by our supreme court,

> A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981), perm. to appeal denied, (Tenn. 1982) (citation omitted). Declarations of a co-conspirator that would otherwise be inadmissible may be offered as proof, when the following conditions are met: (1) there is evidence of the existence of the conspiracy and the connection of the declarant and the defendant to it; (2) the declaration was made during the pendency of the conspiracy; and (3) the declaration was made in furtherance of the conspiracy. State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992), perm. to appeal denied, (Tenn. 1993) (citations omitted). A "statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project." State v. Carruthers, 35 S.W.3d 516, 556 (Tenn. 2000) (citation omitted). If a conspiracy is shown to exist, the co-conspirator's statement is admissible even though no conspiracy has been formally charged. Lequire, 634 S.W.2d at 612 n.1.

For admissibility purposes, the standard of proof required

to show the existence of the prerequisite conspiracy is proof by a preponderance of the evidence. State v. Stamper, 863 S.W.2d 404, 406 (Tenn. 1993). The State only has to show an implied understanding between the parties, not formal words or a written agreement, in order to prove a conspiracy. Gaylor, 862 S.W.2d at 553. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprises." Id. (citation omitted).

State v. Berry, 141 S.W.3d 549, 585 (Tenn. 2004).

It is the second requirement that the appellant challenges on appeal, arguing that the evidence does not show a conspiracy existed at the time of Goss's statement. We disagree. On the afternoon before the shootings, Goss told Jamilia Harvey that she was going to commit a robbery, and Jamilia saw the appellant with a gun at Goss's home. After the appellant arrived at the house, Goss told the children again that she was going to commit a robbery. Sometime between midnight and 3:00 a.m. on September 11, Goss told Daphane Harvey that she needed money for her house and "wanted to get somebody." Our review of the appellant's telephone records shows that between 11:05 p.m. on September 10 and 2:55 a.m. on September 11, about the time Goss was making her statement to Harvey, the appellant and Goss exchanged seventeen telephone calls. Between 3:02 a.m. and 3:54 a.m., about the time of the shootings, the appellant and Goss exchanged another thirteen calls. Finally, Kemur Bryant heard the appellant say that the appellant's girlfriend set up the robbery, and the evidence at trial established that Goss was the appellant's girlfriend or ex-girlfriend. In our view, the proof at trial established by a preponderance of the evidence that a conspiracy existed between the appellant and Goss. See State v. Charles R. Cain, C.C.A. NOS. 956 and 957, 1992 Tenn. Crim. App. LEXIS 29, at *25 (Knoxville, Jan. 10, 1992) (stating that numerous telephone calls between the defendants were evidence of a conspiracy between them). Furthermore, the timing of the telephone calls and the appellant's presence on Aspen Drive about 3:00 a.m. establish that Goss made her statement to Harvey during the course of the conspiracy. The trial court properly allowed Harvey to testify about Goss's statement.

B. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions. Regarding the felony murder convictions, he contends that Kemur Bryant and Lonnie Anderson gave such contradictory statements that the rule of cancellation negates their testimony. Regarding the attempted robbery convictions, the appellant contends that there is no evidence he intended to rob the victims. The State contends that the evidence is

sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee law recognizes a rule of cancellation when a witness makes contradictory, sworn statements. Bowers v. Potts, 617 S.W.2d 149, 154 (Tenn. Ct. App. 1981). Simply put, the rule of cancellation provides that "'contradictory statements of a witness in connection with the same fact have the result of cancelling each other out.'" Id. (quoting Taylor v. Nashville Banner Publishing Co., 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). However, the rule only applies when both statements are sworn and when there is no corroboration for either statement and no explanation for the inconsistency. State v. Caldwell, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1998).

The appellant argues that the rule of cancellation applies to Bryant's and Anderson's testimony and cites inconsistencies in the details of their prior testimony and trial testimony. For example, the appellant argues that Bryant's testimony at the second trial was more specific than his testimony at the first trial. The appellant has provided a transcript of the appellant's first trial in the appellate record. Our review of the trial transcript reveals that while Bryant's testimony at the second trial may have been more specific than it was at the first trial, his testimony at the two trials was not inconsistent. Regarding Anderson's testimony, the appellant argues that Anderson said during the preliminary hearing that no one was in the car with the appellant but said at the second trial that she saw someone in the car with him. However, the appellant is incorrect. Our review of the preliminary hearing transcript shows that Anderson testified on cross-examination that one other person was in the car with the appellant when she saw him on September 11. Granted, Anderson gave some testimony at the second trial that was somewhat contradictory to her prior testimony.

-11-

For example, Anderson testified at the second trial that she saw the appellant on Aspen Drive about 3:00 a.m. but testified at the preliminary hearing that she saw him about 3:30 a.m. However, defense counsel questioned Anderson about the inconsistencies, and the jury obviously accredited her testimony. We conclude that the evidence is sufficient to support the appellant's felony murder convictions.

Regarding the appellant's attempted robbery convictions, robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tennessee Code Annotated § 39-13-401(a). As the trial court instructed the jury,

> [a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3). Under this definition of attempt, "[c]onduct does not constitute a substantial step . . ., unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

Jamilia Harvey testified that on the afternoon before the shootings, Goss said she was going to commit a robbery, and the appellant arrived with a gun at Goss's home. Daphane Harvey testified that Goss said she needed money for her house. About an hour before the shootings, Goss told Harvey that Goss wanted to get someone, meaning rob the person. Harvey saw Goss talking with the victims at Paul's Market, and the victims followed Harvey and Goss back to Goss's house. Numerous telephone calls between Goss and the appellant demonstrate that they were in almost constant contact with each other before and after the shootings, and Lonnie Anderson saw the appellant on Aspen Drive near the time of the shootings. Kemur Bryant testified that sometime after the crimes, the appellant said he shot two people, claimed the motive was robbery, and said his girlfriend set up the robbery. Taken in the light most favorable to the State, the evidence is sufficient to show that the appellant shot the victims during the perpetration of attempted robbery. The appellant is not entitled to relief.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE