# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 8, 2016 Session

## STATE OF TENNESSEE v. XAVIER TULL-MORALES

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-2035     J. Randall Wyatt, Jr., Judge**

---

### No. M2015-01368-CCA-R3-CD – Filed September 19, 2016

---

The Davidson County Grand Jury returned an indictment against the Defendant-Appellant, Xavier Tull-Morales, and his two codefendants, Alberto Conde-Valentino and Rodney Earl Jones, charging them with one count of first degree felony murder and one count of especially aggravated robbery. Conde-Valentino filed a motion to sever the defendants' cases, which Tull-Morales joined, and the trial court denied the motion. Following a jury trial, Tull-Morales, along with his codefendants, were found guilty of the charged offenses of felony murder and especially aggravated robbery, and he received concurrent sentences of life imprisonment and fifteen years, respectively. On appeal, Tull-Morales argues: (1) the trial court abused its discretion in denying his motion to sever his case from that of his codefendants; (2) the trial court erred in failing to instruct the jury that accomplice testimony and/or co-conspirator testimony must be corroborated; and (3) the evidence is insufficient to sustain his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, J., joined.

David A. Collins, Nashville, Tennessee, for the Defendant-Appellant, Xavier Tull-Morales.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Brian Ewald and Amy Hunter, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the robbery and shooting death of the victim, Victor Parham. Rodney Earl Jones, Alberto Conde-Valentino, and Xavier Tull-Morales were subsequently arrested and charged with first degree felony murder and especially aggravated robbery of the victim. In their joint trial, all three codefendants were convicted as charged.

**Trial.** In the early morning hours of March 15, 2012, the dead body of the victim was discovered in his home by the victim's girlfriend, Starnesha Grant, and the victim's brother, Darius Parham. The previous day, Grant and Darius Parham had tried unsuccessfully to contact the victim. Although the victim owned a lawn care business, he also sold drugs including marijuana, prescription pills, and ecstasy pills, and frequently had large amounts of cash on hand. The victim and Rodney Jones were friends and had once been roommates. Jones was aware that the victim often kept large sums of money in different places on his person, in case he was stopped by the police or was robbed.

Officers responding to the crime scene noticed five spent shell casings and some blood near the victim, who was lying on the floor near the front door. They also saw a knife, that did not contain blood or fingerprints, and what appeared to be a low velocity bloodstain on a closet door near the knife. After examining the victim, officers determined that he had been fatally shot, though there was not a substantial amount of blood at the crime scene. Upon conducting a search of the victim's residence, officers found an ice chest in one of the upstairs bedrooms that contained two hundred and fifty-one dollars in cash and a plastic bag containing a substance presumed to be drugs. Hydrocodone and another plastic bag filled with a substance presumed to be drugs were found in a different location in the victim's home.

Gun-shot residue tests performed on Starnesha Grant and Darius Parham were negative. Still shots taken from video surveillance footage of a Bar-B-Cutie restaurant near the victim's address showed a black SUV at the location of the restaurant at 11:56 a.m. and at 1:39 p.m. on March 14, 2012. A couple of weeks after the victim's death, Darius Parham and some family members found a bullet on the floor of the victim's apartment near where the victim's body was found, and this bullet was collected by the police. Examination of the five fired .380 automatic cartridge cases collected from the crime scene revealed that they had been fired from the same weapon. In addition, examination of the four bullets that were recovered from the victim's body and the one bullet recovered from the crime scene showed that all five of these bullets had been fired through the barrel of the same gun. DNA from the bloodstain on the closet door matched the DNA of Conde-Valentino. Evidence was presented showing that if a person was not holding a handgun properly or had large hands, the fleshy part of the shooter's hand

between their thumb and forefinger could be cut when the slide on the handgun came back.

Around March 31, 2012, after the police received a tip that some Hispanic men may have been involved in the victim's death, Detective Injaychock interviewed Iris Pinson, who was thought to know these Hispanic men. Several weeks later, Pinson contacted Detective Injaychock and told him that Jones, Conde-Valentino, and Tull-Morales were involved in the murder of the victim. After receiving this information, Detective Injaychock was able to determine that Rodney Jones had made several phone calls to the victim prior to the offenses and was the last person to call the victim before the victim died. He later learned that Jones's cell phone "pinged" off of a cell phone tower that was located "almost in front of the [victim's] residence on Allen Road" during Jones's last telephone conversation with the victim. Detective Injaychock also connected Jones's black SUV to the crimes:

> Pinson had mentioned that [all three codefendants] showed up at her house driving [Jones's black Yukon, and] there were Facebook photos of Mr. Jones and [Tull-Morales] posing near it; and then we also saw the Bar-B-Cutie video of the GMC [Yukon] driving at the time of the cell phone hitting off of the tower.

He acknowledged that the surveillance videotape from the Bar-B-Cutie restaurant did not show the individual sitting in the passenger seat of the vehicle or the license plate number for the vehicle, although he was able to identify it as a black GMC Yukon with white trim. A black GMC Yukon with the same trim was later found at the home Jones shared with his girlfriend, and this vehicle appeared to be the same vehicle that was in the Facebook photographs and the Bar-B-Cutie videotape. This Yukon tested negative for blood. Detective Injaychock later interviewed Conde-Valentino, who stated that he did not know the victim and had never been to the victim's residence but knew Jones and Tull-Morales.

When Detective Injaychock interviewed Jones in June 2012, Jones said that he was friends with the victim, did not give a definite answer about whether he had seen the victim on March 14, 2012, and denied being involved in the victim's death. Jones said he knew Conde-Valentino and Tull-Morales but denied taking Tull-Morales to Florida. Detective Injaychock admitted that there was no fingerprint or DNA evidence or any cell phone evidence connecting Tull-Morales to the offenses in this case. He also admitted that although Pinson had said Tull-Morales was covered in blood when he came to her apartment, the crime scene did not contain large amounts of blood. Detective Injaychock stated that although Pinson said Tull-Morales claimed he shot the victim in the face, the physical evidence showed that the victim did not sustain any gunshot wounds to his face.

-3-

He acknowledged that much of the information that Pinson provided to him had come from admissions made by the defendants themselves. However, Detective Injaychock noted that Tull-Morales had admitted he was at the crime scene during a recorded telephone conversation he had with Pinson. Cell phone records showed that on March 14, 2012 at 12:16 p.m., Jones called the victim, leaving a visual voice mail for him, and that during this communication both Jones's cell phone and the victim's cell phone used a cell tower near the victim's apartment. There was no evidence that Conde-Valentino or Tull-Morales had a cell phone.

Iris Pinson testified that she knew Tull-Morales because they were neighbors at the J.C. Napier housing project in March 2012 and that Tull-Morales's nickname was "Rico." She and Tull-Morales became friends and saw each other on a daily basis. Although Tull-Morales expressed a romantic interest in Pinson, she claimed they never dated. Pinson said she knew Conde-Valentino and Jones because she had seen them with Tull-Morales several times. She was aware that Jones drove a large black SUV.

Pinson said that on a morning in March 2012, Tull-Morales, Conde-Valentino, and Jones came to her house. During this visit, Tull-Morales informed Pinson "that he was going to rob somebody," and this statement was overheard by Conde-Valentino and Jones. Conde-Valentino also stated that he was going to rob someone. Pinson recalled that Conde-Valentino "was really excited and hyped" about the impending robbery. She also remembered Jones saying that they would get "[d]rugs and money" from the robbery. None of the three men mentioned the name of the victim of the robbery. When the men left her home that morning, Conde-Valentino and Jones had guns "in plain view." Although Tull-Morales claimed to have a gun that day, Pinson did not believe him because she did not think he had enough money to buy a gun.

Jones, Conde-Valentino, and Tull-Morales left Pinson's home in Jones's black SUV, with Jones driving, and she did not see the men again until they returned in the black SUV once it was dark. When Pinson let them into her home, she noticed that Tull-Morales "had blood on him . . . . On his hands, on his shirt." Pinson said that while Tull-Morales's t-shirt "wasn't complete soaked," there "was a lot of blood" on it. Tull-Morales removed his shirt and changed into clothes that he had at her house. Pinson also recalled that Tull-Morales had "money and drugs" in his pockets. She said he was "very messed up off the drugs, so he was flashing [the money]." She said Tull-Morales had a plastic bag with cocaine in it and another plastic bag with "a bunch of pills in it."

Pinson said Conde-Valentino also "had blood on him," was "really nervous and shaky," and "kept saying that he was going to go to jail." Conde-Valentino had blood on his shirt and hands and, like Tull-Morales, he took off his shirt while at Pinson's home.

-4-

Pinson said that Jones "just had a little blood on his hands [that was] kind of smeared, but he wasn't like [Tull-Morales] and [Conde-Valentino]." She confirmed that Jones did not have any blood on his shirt. After Tull-Morales and Conde-Valentino removed their blood-stained shirts, they placed them in a grocery bag and gave them to Jones, who took them with him when he left Pinson's home.

Pinson reiterated what Tull-Morales had told her about his activities that day:

[Tull-Morales] told me that he waited in the car for a really long time and then he told me that he went up the stairs and knocked on the door and said that he had to go to the bathroom. He was let in and he said that the couch was sitting this way and he said he walked past [the person they planned to rob] and got his attention and he shot him. He said he blew his face off.

Pinson also recounted the statements Conde-Valentino made about what he had done that day:

[Conde-Valentino] said he . . . walked up the stairs, knocked on the door and was let in and he . . . ran around the couch and he was stabbed, I don't remember if he said Rodney [Jones] or him did it, but he said that he stabbed him and he said he unloaded on him.

Pinson said that Conde-Valentino "was very shaky," "very nervous," and "very scared" and that "[h]e kept saying he knew he was going to go to jail." Pinson also recalled Conde-Valentino becoming physically ill at her home, stating, "He threw up all over the place. He threw up more than once off of the back porch, he threw up upstairs."

Finally, Pinson recalled the statements Jones made at her house that night:

[Jones] said for us to keep our mouth shut about what had happened, he told me to keep my mouth shut about what is going on at the house whenever they got back and he said that he didn't know what anybody was talking about . . . he just pretended like nothing had happened.

Pinson said that when the men first returned to her home, they were arguing. They "had the drugs and they were just nervous and [Jones] just kept saying he didn't know what anybody was talking about, pretty much." Pinson said that the money and drugs "had been split up as far as [she] understood, but [that Tull-Morales] and [Conde-Valentino] were mad because they felt they didn't get their fair share." She added that the proceeds from the robbery were "supposed to be split up three ways."

Pinson noted Jones, Conde-Valentino, and Tull-Morales did not stay at her home very long. She told them "they had to leave [because] it was chaotic and [her] kids were asleep." She said she did not call the police about what she had observed because she was afraid that these men or their friends would hurt her and her children. Pinson saw Tull-Morales every day after the incident, and he would tell her that "he blew [the victim's] face off" and "would talk about how pieces of his hair and stuff was all over the place."

A couple of weeks later, Pinson and Tull-Morales saw a news story on television about the victim's death:

> [The news] showed a picture of the apartment with the crossing stuff all over it and [Tull-Morales] said, that's it, and me and my sister were sitting on the couch, you know, watching [the news story,] and we knew the place[.]
> . . . .
> . . . And then a picture of Victor [Parham], Vic, popped up and I realized that I knew him and so did my sister.
> . . . .
> Whenever I said that I knew [Parham], [Tull-Morales], uh, he kept— he told me that he was sorry and he, you know, was trying to apologize to me.

Pinson said that a short time after the victim was killed, Tull-Morales told her he was going to Florida because "[h]e had shot Vic and he didn't want to go back to prison[.]" She saw Jones pick up Tull-Morales and some of his family so they could take him to Florida. Once he got to Florida, Tull-Morales contacted Pinson by telephone and on Facebook.

A couple of weeks after the victim was killed but before Tull-Morales went to Florida, the police raided Pinson's house looking for Tull-Morales. At that point, Pinson lied to the police and told them that Tull-Morales was in California. The police left a business card with their contact information, and approximately six weeks after Tull-Morales went to Florida, Pinson contacted the police and told them what she knew about the victim's death. With the assistance of police, she attempted a controlled phone call with Tull-Morales, but he did not answer. A day or two later, Pinson recorded a call with Tull-Morales wherein he admitted that he killed the victim. During this recorded conversation, Pinson asked Tull-Morales if he had shot the victim:

Pinson: Did you shoot him, Baby?

| | |
|---|---|
| Tull-Morales: | Yeah. |
| Pinson: | I'm just worried about you, Baby. |
| Tull-Morales: | Yeah, I know. |
| Pinson: | Rico, why'd you do it, though?  I want you home with me, Poppy. |

At a later point in the call, Tull-Morales said, "I walked into the door and I shoot into the m[-----]-f[-----] in the face."

Pinson said that when Jones, Tull-Morales, and Conde-Valentino first talked about the robbery, she did not believe that they were going to go through with it.  She acknowledged that Tull-Morales had lied about committing crimes before and had bragged about things that were not true in the past in order to make himself appear tougher.  She said she had no way of knowing if the things Tull-Morales told her about the instant offenses were true, including Tull-Morales's claim that he had blown off the victim's face.  She said that Tull-Morales was broke most of the time and that she did not believe he had the money to buy a gun.

Antwoine Jobe testified that he had pending federal charges, unrelated to this case, for possession with the intent to distribute cocaine, possession of a firearm, and other charges, for which he was facing twenty-five years in prison.  He admitted that he had two prior felony convictions for possession with the intent to sell or distribute cocaine.  He explained that he was testifying for the State with the hope that his cooperation in this case would help him receive a shorter sentence for his federal charges.  Jobe acknowledged that he had not been promised anything for his testimony and that he would be required to plead guilty to his pending federal charges.

Jobe said that he had known Rodney Jones since the 1990's and reconnected with him around 2007.  He also knew the victim, Victor Parham, because he grew up with him, although he was not as close to him as he was to Jones.  Jobe admitted that he was a drug dealer and that he sold "[w]eed and cocaine."  Although Jobe knew that the victim "sold weed and pills," he asserted that he and the victim were not rival drug dealers because the victim did not live near him.

Jobe said that the day before the victim was killed, Jones came to his home some time before lunch in the black GMC Yukon that he normally drove.  Jones stopped by to get some gas money and mentioned that "he had his Little G's with him."  Jobe wanted to know who these individuals were, so he exited his home and walked up to the Yukon, where he saw Tull-Morales and Conde-Valentino sitting inside.  Jobe had seen Jones,

Tull-Morales, and Conde-Valentino together on two prior occasions at the J.C. Napier housing project. Jobe said he did not talk to Tull-Morales or Conde-Valentino and went back inside his home where Jones was waiting.

After Jobe returned to his home, he gave Jones twenty dollars and "a blunt of weed[,]" and Jones told him that "they [were] fixing to rob Little Vic." Jobe was aware that "Little Vic" was Victor Parham's nickname, and he said that Tull-Morales and Conde-Valentino did not hear Jones's statement that they were going to rob the victim. Jobe said he tried to persuade Jones not to rob the victim. He maintained that Jones had talked to him about robbing the victim on two prior occasions, claiming that the robbery would be easy because the victim "was not going to do nothing." Jobe knew that Jones and the victim were acquaintances.

Jones explained that he was going to act like a middle man and have someone pretend to sell pills to the victim, and then they were going to steal the money the victim brought to buy the pills. Jones believed that the victim would have $2000 in order to purchase the pills. Jobe said he had told Jones that he was not interested in participating in the robbery of the victim in the past and tried to persuade Jones not to go through with the robbery this time, stating that "anything could happen" and that it was "just not a good idea[.]" After trying to talk Jones out of the robbery for several minutes, Jobe gave him "some extra drugs to go home, to just chill out," and Jones said he was going to drop off Tull-Morales and Conde-Valentino and go home. Jones left with the other two men, and Jobe did not hear from Jones again until 5:00 or 6:00 p.m. that evening, when Jones called and said, "I should have listened to you. Little Vic might be dead." Jones sounded nervous and scared at the time.

The following day, around 9:00 or 10:00 a.m., Jobe went to pick up Jones. By that time, he had already heard on the news that the victim had been killed. Jones got into Jobe's car, and as they were riding around town, Jones "said he met up with [the victim] and . . . it went wrong." Then Jones produced "a little handgun" that was "probably like a .32 automatic or a little small .380 or something." Jones told him "he had to get rid of it[,]" and when he tried to put it in Jobe's glove box, Jobe refused. As Jobe drove over the bridge on Old Hickory Boulevard in Nashville, Jones "just threw [the gun] over in the river." Jobe denied pulling over to the side of the bridge to allow Jones to throw the gun but acknowledged that he "slowed down" so Jones could throw the gun into the river. When Jobe was asked if he assisted Jones in disposing of evidence by slowing down, Jobe replied, "You could say that." Jobe said he did not know whether the gun Jones threw in the river was involved in the victim's death. He asserted that he did not benefit in any way from the crimes committed against the victim and did not receive anything from Jones. During the car ride, Jones admitted that he had been at the victim's house the previous day. Jones also asked Jobe to provide an alibi for him. He wanted Jobe to

-8-

say that Jones had been working for him cutting lawns at the time the crimes against the victim were committed, but Jobe refused.

Approximately a week later, Jones told Jobe that he was going to kill himself. Jones also said that he was concerned about Tull-Morales, who had "said something to his girlfriend or [had] told somebody what [was] going on." Jones said he might have "to do something" to Tull-Morales, which Jones understood to mean "[l]ike kill him or something." Jobe urged Jones not to kill Tull-Morales and suggested that Jones take him to stay with family out of town. Two to three days later, Jones told him that he took Tull-Morales to Florida.

Jobe said he did not want to testify against Jones but was in a difficult situation with his pending federal charges. He asserted that he never contacted or talked to police regarding what he knew about the victim's murder until he realized the sentence he was facing in his federal case. Jobe said he did not know anyone by the name of Iris Pinson and had never met with Pinson to prepare for his testimony at trial.

Dr. Thomas Deering, the medical examiner for Davidson County and an expert in the field of forensic pathology, testified that he visited the crime scene on March 15, 2012, and observed the victim's body, which was later delivered to his office so he could perform an autopsy. Dr. Deering said that the state of the victim's body was consistent with the victim dying around noon on March 14, 2012. He noted that the victim sustained six gunshot wounds, but the most serious wound was from a bullet that entered the victim's left shoulder, hit the top of his left lung, and then ruptured the aorta, which is the artery at the top of the heart. He said this particular gunshot wound was fatal because of the amount of blood loss that it caused:

> There is a lot of blood in the left chest cavity. In fact, there was just under a liter and a half in this area of the lung and then around the heart, even with a hole through the pericardium there was about a quarter of a liter of blood, so pretty much between the two you are pretty much right about two liters of blood, so this was a significant, significant wound. I mean, this is a fatal wound in and of itself.

Dr. Deering noted "there wasn't a lot of blood" at the crime scene because the victim's blood flowed into his chest cavity. He explained:
> [W]hen this [gunshot wound] happened the blood pressure went way down and none of the other wounds bled very much. Now, I can't say for sure that [this wound] was the first one, it could have been, but I can just say the other ones didn't leave a lot of blood on the scene and this one was bleeding and it just—it bled in the easiest place to bleed which was inside

-9-

the chest cavity, when that happened his blood pressure doesn't have enough, enough pressure to force blood out the other wounds and that is why there is not a lot of blood at the scene, it is inside of [the victim] rather than outside of him.

Dr. Deering found no soot or stipple around the wounds, which meant that the handgun that fired the shots was more than two feet away. He opined that the cause of the victim's death was multiple gunshot wounds, and the manner of death was homicide. He acknowledged that because there was not a lot of blood outside the victim's body, he did not know "how someone else's clothing could [have been] saturated" with the victim's blood. He said he found no stab wounds on the victim's body.

## ANALYSIS

Initially, we must consider whether Tull-Morales's motion for new trial was timely. At the conclusion of trial, the jury found Tull-Morales and his codefendants guilty of first degree felony murder and especially aggravated robbery. The trial court entered the judgment regarding Tull-Morales's felony murder conviction on May 13, 2014. On June 18, 2014, more than thirty days after entry of the felony murder judgment, Tull-Morales filed his motion for new trial, which included the issues he argues in this direct appeal. See Tenn. R. Crim. P. 33(b) ("A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered."). On July 8, 2014, the trial court entered the judgment regarding Tull-Morales's especially aggravated robbery conviction.

We note that "'where there is a single trial for felony murder and the underlying felony, and where the sentences are entered on different days, we interpret Rule 33(b) as to require a motion for new trial to be filed within thirty days of the day the last sentence is entered.'" State v. Hatcher, 310 S.W.3d 788, 801 (Tenn. 2010) (quoting State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004)). Because Tull-Morales's motion for new trial was filed within thirty days of entry of the especially aggravated robbery judgment of conviction, which was the last sentence entered, we conclude that his motion for new trial was timely as to both the felony murder conviction and the especially aggravated robbery conviction. We will now consider Tull-Morales's issues on their merits.

**I. Motion to Sever.** First, Tull-Morales argues that the trial court erred in failing to sever his trial from that of his codefendants. He asserts that this was "a classic case of guilt by association only," and that he was convicted based on the proof against codefendant Rodney Jones, which would not have been admissible against him if his trial had been severed. The State responds that the trial court properly denied the motion to sever and correctly admitted portions of Antwoine Jobe's testimony, which included

-10-

Jones's statements to Jobe about the offenses, because this proof was admissible against Tull-Morales.

The record shows that approximately two weeks prior to trial, the State filed a motion to determine the admissibility of codefendant Jones's statements to Jobe. In its motion, the State argued that Jones's statements, except those statements in which Jones specifically identified and incriminated Conde-Valentino and Tull-Morales in violation of Bruton v. United States, 391 U.S. 123 (1968), were admissible pursuant to Tennessee Rule of Evidence 803(1.2), which is the hearsay exception for statements of co-conspirators. This motion prompted the attorney representing Conde-Valentino to file a motion to sever his client's case from that of the other codefendants on the basis that Jones's statements violated Conde-Valentino's right of confrontation under Bruton.[1] On the day the motion to sever was heard, Tull-Morales joined in the motion.

Antwoine Jobe testified at the pre-trial hearing regarding the State's motion to determine the admissibility of Jones's statements to Jobe and regarding Conde-Valentino's and Tull-Morales's motions for severance. Much of Jobe's testimony was substantially the same as his later testimony at trial. However, we have summarized the pertinent portions of Jobe's testimony from the pre-trial hearing that are relevant to the trial court's ruling on these motions.

Antwoine Jobe testified that around noon on March 14, 2012, the day the victim was killed, Jones came to his house in a black SUV that he frequently drove. Jobe saw Tull-Morales and Conde-Valentino inside this SUV. Jones asked for some gas money, and when Jobe gave him $20 and "a blunt of weed," Jones told him that "he had his lil Gs with him," referring to Conde-Valentino and Tull-Morales. Jones then told Jobe, "We're finna go rob Lil Vic." Jobe explained that "Lil Vic" was the nickname of Victor Parham, the victim in this case, and recalled that Jones had previously talked to him about robbing the victim.

Jones told Jobe that it would be easy to rob the victim because "he [was] not going to do nothing." Jones explained that he was going to have Tull-Morales or Conde-Valentino pretend that they were going to sell pills to the victim and then they were going

---

[1] The record shows that counsel for Conde-Valentino filed an initial motion for severance more than a year prior to trial, which was denied. Although the record indicates that a second motion for severance was filed by counsel for Conde-Valentino and joined by counsel for Tull-Morales in response to the State's motion to determine the admissibility of Jones's statements, this second motion for severance is not included in the appellate record. However, because the transcript from the hearing on these motions and the trial court's order regarding these motions are included in the record, we are sufficiently apprised of the arguments made by the attorneys representing Conde-Valentino and Tull-Morales as to the second severance motion.

to steal the money the victim was using to buy the pills. Jones believed that the victim would have approximately $2000 in order to buy the pills. Jobe said Jones asked him to help them rob the victim, but Jobe declined and tried to talk Jones out of his plan. Jobe gave Jones some additional drugs so that he would "[j]ust go home and chill out" rather than robbing the victim. Jobe believed that he had successfully convinced Jones not to rob the victim.

That evening, Jones called Jobe on his cell phone and said, "I should've listened to you, Bro[.]" When Jobe said, "What?," Jones replied, "About [Lil] Vic. He might be dead." The following day, Jones called Jobe again and said he needed to talk to him, and Jobe picked up Jones. After getting in the car, Jones told him that he was inside the apartment with the victim and was waiting for Conde-Valentino, who was pretending to sell pills to the victim, when "it went wrong." When Conde-Valentino came into the victim's apartment, the victim "jumped off the couch and [Conde-Valentino, who] was supposed to have the pills[,] pulled out a gun and [said] 'set it out' and [when the victim] reached for a gun," Conde-Valentino shot him "seven or eight times." Jones told Jobe that they "got [the victim's] money," which was approximately $2000, and took the victim's cell phone. Jones said he, Conde-Valentino, and Tull-Morales split up the money, but he did not disclose whether they took any drugs or any other property from the victim. Jones stated that after the incident, he dropped off Conde-Valentino and Tull-Morales. Jobe maintained that Jones "was shook up pretty bad" when he was talking about the incident.

Later, as they were driving around, Jones "showed [him] a gun that was in his pocket." Jobe described the gun as a "small caliber gun" that was "chrome" and "an automatic." Jones said he needed to get rid of the gun and tried to put it in Jobe's glove box, but Jobe refused. Then Jobe drove over the bridge on Old Hickory Boulevard in the Hermitage area, and Jones threw the gun out the vehicle's window and into the river. Jones asked Jobe if he could use him as an alibi, but Jobe refused. Jones then told him that during the robbery and murder of the victim, Tull-Morales stayed in the car and never went inside the victim's apartment.

A few days later, Jobe met up with Jones, who had Conde-Valentino and Tull-Morales in his vehicle, at the housing projects in South Nashville. Jones left Conde-Valentino and Tull-Morales in his vehicle, got into Jobe's vehicle, and told him that Tull-Morales "had said something to his girl . . . about what happened and . . . he [thought Tull-Morales] was going to crack." Jones said he might have "to do something" to Tull-Morales, which Jobe understood to mean "kill him or something." Jobe said, "[N]aw, I wouldn't do that, man," and suggested that Jones take Tull-Morales out of town to stay with family. During this conversation, Jones disclosed that he thought the police

suspected them of killing the victim. A day or two later, Jones told Jobe he had taken Tull-Morales to Florida.

Jobe asserted that he did not agree to rob the victim with Jones and claimed he believed that Jones was not going to go through with the robbery. However, he admitted he never warned the victim that he was the target of a robbery. Jobe said he did not see Jones's weapon the day of the murder and had never seen Jones in possession of a weapon prior to the day the victim was killed.

After hearing this testimony, the trial court held that there was sufficient evidence to show that Jones, Conde-Valentino, and Tull-Morales participated in a conspiracy to rob and kill the victim:

> [T]he Court finds that the State has established by a preponderance of the evidence that the Defendants participated in a conspiracy to rob, and ultimately kill the victim. There is ample evidence in support of this conclusion. The testimony at the hearing proved, by a preponderance of the evidence, that all three Defendants arrived at Mr. Jobe's house together; that according to defendant Jones, they committed the offense together, and; that Defendant Jones aided Defendant Tull-Morales in fleeing to Florida. The Court also recalls from a previous hearing in this case that there are statements from Defendant Tull-Morales tending to prove his involvement in the crime. In light of all the evidence before the Court, the Court finds that the State has met its burden in proving the existence of a conspiracy such that Rule 803[(1.2)](E) is applicable.

The trial court then determined the admissibility of each of Jones's statements to Jobe. It held that Jones's statements that did not involve Tull-Morales and Conde-Valentino, namely, "I should have listened to you" and "I'm gonna get rid of the gun" did not involve Tull-Morales and Conde-Valentino and, therefore, were admissible.

The trial court held that Jones's statements that he and the codefendants were planning to rob the victim and that he tried to recruit Jobe in the robbery, as well as other statements made contemporaneously, "were made during and in furtherance of the conspiracy." The court found that these statements were admissible as an exception to the hearsay rule because they had to do with planning the conspiracy and enlisting the assistance of Jobe.

The trial court also addressed the statements Jones made after the commission of the offenses:

-13-

Regarding the statements made after the offense, the Tennessee Supreme Court has stated that "[t]he commission of the offense . . . does not necessarily end the conspiracy, nor does it preclude the possibility that the conspiracy encompassed later statements regarding concealment of the offense." [State v. ]Henry, 33 S.W.3d [797, ]803 [(Tenn. 2000)] (citing [State v. ]Walker, 910 S.W.2d [381, ]38[5] [(Tenn. 1995))]. However, the statements must still be made "during the conspiracy." That is, the conspiracy may continue after the commission of the criminal offense.

The Court finds, and the State concedes, that Defendant Jones' statements regarding who did what in connection with the offense are clearly inadmissible, as they fall into the category of narrative statements of past conduct between conspirators. The Court will not allow Mr. Jobe to testify about these statements.

Regarding the alleged statement by Defendant Jones that he was worried about Defendant Tull-Morales "breaking," that he considered killing Tull-Morales, and that he took Tull-Morales to Florida, the Court finds that these statements were also made during and in furtherance of the conspiracy. The Court finds that the conspiracy had not ended, as the Defendants were still acting to conceal their crimes. The Court acknowledges that this statement was made by one co-conspirator against another. However, "[o]nce the conspiracy is established, it is unreasonable to expect that the parties to the conspiracy will act together on each step of furtherance. State v. [Richard Frank] D'Antonio, M2003-03052-CCA-R3-CD, 2005 WL 2874657 (Tenn. Crim. App. Oct. 26, 2005)[, perm. app. denied (Tenn. May 1, 2006)]. The Court finds that, at the very least, the conspiracy as between Defendants Jones and Conde-Valentino was still active and in the concealment stage. Moreover, the Court notes that ultimately Defendant Jones assisted Defendant Tull-Morales in fleeing to Florida, which was clearly an effort in concealment. Therefore, the Court finds that these statements also fall within the co-conspirator exception to the hearsay rule and are admissible.

After determining that the aforementioned portions of Jobe's testimony would be admissible against all three defendants, the trial court declined to find that "a single trial in this case would unfairly prejudice the rights of Conde-Valentino or Tull-Morales. It added that "the law allows for the statements at issue to be admitted" and that "a severance is not necessary in this case."

-14-

We note that Tull-Morales requested a severance prior to trial and again in his motion for new trial, contending that Jones's statements, which implicated both Jones and Tull-Morales, would not have been admissible against him in a separate trial. On appeal, he claims that he clearly suffered prejudice in the joint trial when the trial court admitted Jones's statements against him and failed to instruct the jury that it could not convict him based on the uncorroborated testimony of an accomplice or co-conspirator.

Trial courts often try codefendants together in order to promote "judicial economy and efficiency." Tenn. R. Crim. P. 8, Advisory Commission Cmts. In this case, Tull-Morales requested a severance based on the out-of-court statements made by codefendant Jones. Tennessee Rule of Criminal Procedure 14(c)(1) governs a defendant's motion for severance based on a co-defendant's out-of-court statement:

> If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the state intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:
>
> (A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;
> (B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or
> (C) severance of the moving defendant.

Tenn. R. Crim. P. 14(c)(1).

The decision to grant or deny a motion for severance of defendants rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion. State v. Dotson, 254 S.W.3d 378, 390 (Tenn. 2008) (citing Hunter v. State, 440 S.W.2d 1, 6 (Tenn. 1969), vacated on other grounds by Hunter v. Tennessee, 403 U.S. 711, 712 (1971); State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). "Where a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[.]" State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000). The defendant must show that he or she "was clearly prejudiced to the point that the trial court's discretion ended and the granting of severance became a judicial duty." Parham v. State, 885 S.W.2d 375, 383 (Tenn. Crim. App. 1994) (citing Hunter, 440 S.W.2d at 6).

-15-

In determining whether to grant a motion to sever, the trial court must balance the rights of the defendants against the rights of the State:

> The state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants.

Woodruff v. State, 51 S.W.2d 843, 845 (Tenn. 1932).

To support his claim that a severance should have been granted, Tull-Morales argues that without Jones' admissions, the evidence against him was minimal. He notes Detective Injaychock's testimony that no forensic evidence placed Tull-Morales at the crime scene and claims that only Jones's statements connected him to the charged offenses. He also asserts that Pinson's testimony failed to place him at the crime scene because her testimony was inconsistent with the other evidence, especially the proof showing that the victim was not shot in the face, as she claimed. Finally, he references Jobe's testimony that Tull-Morales "never got out of the vehicle, never came into his house, and was not privy to any of the damning remarks [about the offenses] attributed to Jones." He claims that the trial court's decision to admit Jones's admissions in the joint trial as "statements in furtherance of the conspiracy" was erroneous because the trial court never charged the jury regarding the existence of a conspiracy and declined to instruct the jury regarding statements of co-conspirators. Although Tull-Morales concedes that a disparity in the evidence alone is insufficient to warrant the grant of a severance, see State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000), he claims that he was clearly prejudiced when the trial court admitted Jones's statements against him and failed to instruct the jury that it could not convict him based on the uncorroborated testimony from an accomplice or a co-conspirator, see Price, 46 S.W.3d at 802-03.

At the pre-trial hearing regarding the motion to sever, the trial court held that many of Jones's statements were admissible as an exception to the hearsay rule as statements of a co-conspirator under Tennessee Rule of Evidence 803(1.2)(E). Pursuant to this rule, "statement[s] by a co-conspirator of a party during the course of and in furtherance of the conspiracy" are not excluded by the hearsay rule. Tenn. R. Evid. 803(1.2)(E); see Tenn. R. Evid. 801(c), 802. "A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means." State v. Carruthers, 35 S.W.3d 516, 555 (Tenn. 2000) (citing State v. Alley, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997); State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); State v. Houston, 688 S.W.2d 838, 841 (Tenn. Crim.

App. 1984); State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981)).  Moreover, "Bruton v. United States . . . does not prohibit the use as evidence a co-conspirator's statements against another co-conspirator."  Lequire, 634 S.W.2d at 613 (citing United States v. Kendricks, 623 F.2d 1165, 1167-68 (6th Cir. 1980)).  However,

> To be admissible under the co-conspirator hearsay exception, a statement must be made "during the course of" a conspiracy.  Tenn. R. Evid. (803)(1.2)(E).  This means that the conspiracy must have been occurring or ongoing at the time the statement was made.  See State v. Walker, 910 S.W.2d 381, 385 (Tenn. 1995);[See] Gaylor, 862 S.W.2d at 554; Neil Cohen et al.  If the conspiracy had not begun or had already concluded when the statement was made, the statement will not be admissible under the co-conspirator exception.  [Gaylor, 862 S.W.2d at 554].  The exception also requires that the statement be "in furtherance of" the conspiracy.  In short, the statement must be one that will advance or aid the conspiracy in some way.  See State v. Heflin, 15 S.W.3d 519, 523 (Tenn. Crim. App. 1999).

Carruthers, 35 S.W.3d at 555.  Statements in furtherance of the conspiracy "'include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project.'"  Id. at 556 (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 803(1.2)(6) (3rd ed. 1995) (hereinafter "Cohen")).  A conspiracy continues until the objectives of the conspiracy are completed, and objectives may include, but are not limited to, "escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it."  T.C.A. § 39-12-103(e)(1).  Rule 803(1.2)(E) does not require that these statements be made to other conspirators; consequently, "[s]tatements to third parties may qualify if in furtherance of the conspiracy."  Carruthers, 35 S.W.3d at 556 (quoting Cohen § 803(1.2)(6)).  Once a conspiracy exists, "everyone entering into the conspiracy is a party to every act which has before been done by the others and to every act by the others afterward in furtherance of the common design."  Id. (quoting Owens v. State, 84 Tenn. 1, 4 (Tenn. 1885)).

The law distinguishes between statements made in the furtherance of the conspiracy and statements made in casual conversation.  "Casual conversation between or among co-conspirators is not considered to be in furtherance of the conspiracy."  Id. (citing State v. Hutchison, 898 S.W.2d 161, 170 (Tenn. 1994)).  This rule may also apply when a conspirator casually converses with a third party, including the police.  Id. (citing Walker, 910 S.W.2d at 386).  In those situations, the statement "'becomes only a narrative statement of past conduct between conspirators'" and cannot be considered a

statement made in furtherance of the conspiracy. Id. (quoting Walker, 910 S.W.2d at 386).

In order for a co-conspirator's statement to be admitted, the existence of the prerequisite conspiracy must be proven by a preponderance of the evidence. State v. Berry, 141 S.W.3d 549, 585 (Tenn. 2004) (citing State v. Stamper, 863 S.W.2d 404, 405-06 (Tenn. 1993)). An implied understanding between the parties, rather than formal words or a written agreement, is sufficient to prove a conspiracy, and the conspiracy may be proven through circumstantial evidence. Id. (citing Gaylor, 862 S.W.2d at 553).

In determining whether a statement is hearsay and, if so, whether it fits within one of the exceptions to hearsay, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759–61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review." Id. (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

In this case, the trial court found at the pre-trial hearing that a conspiracy existed between Jones, Conde-Valentino, and Tull-Morales before determining that portions of Jobe's testimony about Jones's statements were admissible at trial. The court found that the State established by a preponderance of the evidence that Jones, Conde-Valentino, and Tull-Morales participated in a conspiracy to rob and kill the victim, which made the co-conspirator hearsay exception in Rule 803(1.2)(E) applicable. The evidence supporting the existence of this conspiracy was that all of the defendants arrived at Jobe's house together, that they committed the offenses together, that Jones helped Tull-Morales flee to Florida after the offenses, and that Tull-Morales made statements indicating his involvement in the offenses. We agree with the trial court that the existence of this conspiracy was proven by a preponderance of the evidence. Although Tull-Morales does not point to specific statements made by Jones that would have been inadmissible, choosing instead to generally claim that none of the statements would have been admissible if his trial had been severed, we conclude that Jones's statements ruled admissible by the trial court were in fact statements of a co-conspirator "during the course of and in furtherance of the conspiracy." Tenn. R. Evid. 803(1.2)(E).

Tull-Morales argued in the pretrial severance motion and appears to argue on appeal that Jones's statements were inadmissible against him because they violated his right of confrontation pursuant to Bruton. In Bruton, the United States Supreme Court

-18-

held that the admission in a joint trial of a codefendant's hearsay statements that incriminated the defendant violated the defendant's right of cross-examination guaranteed by the Confrontation Clause. Bruton, 391 U.S. at 135-37. "[T]he Bruton rule proscribes, generally, the use of one co-defendant's confession to implicate the other as being violative of the nonconfessing co-defendant's Sixth Amendment right of confrontation." State v. Elliot, 524 S.W.2d 473, 477 (Tenn. 1975). However, "the rule in Bruton does not apply to confessions which [d]o not implicate the non-confessing defendant, nor does it apply to confessions from which all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant." Dorsey v. State, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978) (citation and internal quotation omitted). As relevant in this case, the Bruton rule was limited to hearsay "clearly inadmissible against [the defendant] under traditional rules of evidence." Bruton, 391 U.S. at 128 n.3. As we previously recognized, the co-conspirator exception is a firmly rooted hearsay exception, and Bruton does not prohibit the use of a co-conspirator's statements against another co-conspirator. See Alley, 968 S.W.2d at 317; Lequire, 634 S.W.2d at 613. Therefore, we agree with the trial court's holding that some of Jones's statements were admissible pursuant to the co-conspirator hearsay exception, and we conclude that admission of these statements did not violate Bruton.

Tull-Morales also argues that he was clearly prejudiced in his defense as a result of being tried with his codefendants when the trial court admitted Jones's hearsay statements pursuant to the co-conspirator hearsay exception without charging the jury regarding conspiracy. As we will explain below, the trial court was not required to instruct the jury regarding the offense of conspiracy as a lesser included offense and was under no obligation to provide a special jury instruction stating that statements of co-conspirators must be corroborated. We have already held that the preponderance of the evidence showed that Jones, Conde-Valentino, and Tull-Morales formed a conspiracy to rob and murder the victim. It is well established that "[i]f a conspiracy is shown to exist, the co-conspirator's statement is admissible even though no conspiracy has been formally charged." Alley, 968 S.W.2d at 316 (citing Lequire, 634 S.W.2d at 612 n.1). Consequently, Tull-Morales is not entitled to relief on this claim.

Tull-Morales further claims that he was clearly prejudiced in his defense when the trial court admitted Jones's statements against him in the joint trial without instructing the jury that it could not convict him based on the uncorroborated testimony from an accomplice. As we will explain, the trial court did not err in declining to instruct the jury that statements of an accomplice must be corroborated. Because the statements made by Jones that were presented at trial were admissible against Tull-Morales as statements of a co-conspirator, we conclude that the trial court did not abuse its discretion in declining to grant Tull-Morales a severance.

-19-

**II.** **Jury Instructions on Accomplice Testimony and/or Co-Conspirator Testimony.** Tull-Morales also contends that the trial court erred in refusing to instruct the jury that a defendant cannot be convicted based on the uncorroborated testimony of an accomplice or a co-conspirator. He claims that Jones was both an accomplice and a co-conspirator and that Jobe became a co-conspirator near the end of the conspiracy when he assisted Jones in disposing of his gun, allegedly the murder weapon, which furthered the goals of escaping from the crime, concealing the crime, and obstructing justice in relationship to the crime. Tull-Morales asserts that he made a request for both the accomplice testimony charge and the co-conspirator charge at trial and contends that the trial court's failure to grant these instructions amounts to reversible error. The State responds that Tull-Morales has waived this issue by failing to place his request for these instructions in writing at trial and that the trial court's failure to provide these instructions did not constitute plain error.

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). "An accomplice has been traditionally defined as one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing Bough, 152 S.W.3d at 464; Clapp v. State, 30 S.W. 214, 216 (Tenn. 1895)). To qualify as an accomplice, it is not enough that a witness had guilty knowledge, was morally delinquent, or participated in a related but separate offense. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. Collier, 411 S.W.3d at 894 (quoting Monts, 379 S.W.2d at 43). This court has previously considered whether the court or the jury determines a witness's status as an accomplice:

> The question of who determines whether a person is an accomplice depends upon the facts of each case. When the facts of a witness' participation in a crime are clear and undisputed it is a question of law for the court to decide. When such facts are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide.

Lawson, 794 S.W.2d at 369 (quoting Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978)). The issue of whether a witness qualifies as an accomplice is a question of law, which is subject to de novo review without any presumption of correctness given to the trial court's holding. Collier, 411 S.W.3d at 894 (citing State v. Robinson, 146 S.W.3d 469, 509 (Tenn. 2004); Blair v. Brownson, 197 S.W.3d 681, 683 (Tenn. 2006)).

"It is well settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have a duty to give "'a complete charge of the law applicable to the facts of a case.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing State v. Rogers, 188 S.W.3d 593, 628-29 (Tenn. 2006); State v. Thacker, No. E2011-02401-CCA-R3-CD, 2012 WL 4078440, at *8 (Tenn. Crim. App. Sept. 18, 2012)).

During a jury-out hearing at trial, Tull-Morales's attorney requested that the trial court charge conspiracy as a lesser included offense of the charged offenses, arguing that the trial court had "already found by a preponderance of the evidence as a matter of law that a conspiracy existed and a conspiracy under State v. Burns is certainly going to be a crime that a reasonable jury could conclude could have had been committed as a lesser included." At that point, the trial court responded: "I'm not inclined to charge conspiracy as a lesser included offense." When the State argued that conspiracy was not a lesser included offense for the charges, the trial court agreed, stating that "the only way that comes in at all is on the evidentiary issue about the admissibility of certain evidence." The record shows the court did not instruct the jury on conspiracy as a lesser included offense of the charged offenses.

During a later jury-out hearing, Tull-Morales's attorney argued that Jobe became an accomplice at the time he slowed his vehicle so that Jones could dispose of what was allegedly the murder weapon. Consequently, he asked the trial court to find as a matter of law that Jobe was an accomplice and to give the appropriate instruction on accomplice testimony, or at a minimum, allow the jury to determine whether Jobe was an accomplice and give the alternate jury instruction for accomplice testimony. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.09, 42.09(a) (16th ed. 2012). The State countered that Jobe was not an accomplice because he did not knowingly, voluntarily and with common intent with the principal unite in the commission of the especially aggravated robbery and first degree felony murder offenses. See Collier, 411 S.W.3d at 894. While the State conceded that Jobe might have been charged with a lesser crime like accessory after the fact or facilitation, it argued that he could not be charged with especially aggravated robbery and felony murder based on the evidence presented at trial. After taking the matter under advisement, the trial court held that because Jobe was not an accomplice in the charged offenses, it would not charge the jury with the instruction requiring corroboration of accomplice testimony:

-21-

> [T]he question of a witness's status as an accomplice is answered by determining whether that person, in this case, Mr. Jobe . . . could have been indicted for the charged offense and . . . from the proof presented in this trial throughout this trial the Court doesn't find any way that Mr. Jobe could be charged with or indicted for the offenses in this case, which is Felony Murder, or Especially Aggravated Robbery and here is the reason[:]
>
> Mr. Jobe was, according to his testimony, was asked to take part in a robbery multiple times and refused. Mr. Jobe tried to talk Mr. Jones out of committing a robbery, accordingly to his testimony, even giving him drugs and money to calm him down, according to his testimony, that will all be a jury issue.
>
> Mr. Jones called Mr. Jobe after the alleged offense and said, "I should have listened to you." Mr. Jones asked, according to Mr. Jobe's testimony, for him, Mr. Jobe to serve as an alibi to which he says he refused and then finally Mr. Jones tried to put the gun in Mr. Jobe's glove box and Mr. Jobe refused him the chance to do that.
>
> The only slight involvement that Mr. Jobe may have had in this matter is that he slowed the car down while giving Mr. Jones a ride as they crossed the river between Old Hickory and Madison and when he did, according to his testimony at least, Mr. Jones threw the gun out the window. That could have led to some kind of lesser charge, maybe, but the Court does not find that there is enough evidence here to charge or indict Mr. Jobe with the charged offenses of Felony Murder and Especially Aggravated Robbery and the Court is of the opinion that this instruction wouldn't be warranted in this case.

At that point, Tull-Morales's attorney asked that Jobe "be considered a co-conspirator that joined a conspiracy before it was over[.]" He asserted that the trial court "relied on case law to let the post-crime statements in saying that the conspiracy can continue beyond the target crime if that includes trying to cover it up or keep from being detected" and claimed that "disposal of the alleged murder weapon would go toward that end[.]" The court immediately replied that it was going to respectfully deny counsel's request based on its previous ruling that this was "an evidentiary issue."

Tull-Morales noted in his motion for new trial that although he "requested a jury instruction relative to the law on co-conspirator's statements, the same was denied by the Court [after] finding that the ruling of a conspiracy only applied to the admission of the statements." He argued that "if the Court finds the existence of a conspiracy, as a matter

-22-

of law, as it did in this case, then the existence of the conspiracy exists for all purposes, including charging the jury on the effect of a co-conspirator's statements on the guilt or innocence of a co-defendant." As a separate issue in his motion for new trial, Tull-Morales argued that the trial court "erred in failing to find that Ant[woine] Jobe was a co-conspirator in this offense" when he assisted Jones in disposing of the murder weapon. While Tull-Morales contends in his motion for new trial that the trial court erred in failing to charge the jury that co-conspirator testimony must be corroborated, he expands this argument in his appellate brief, asserting that the trial court erred in refusing to instruct on both accomplice testimony and/or co-conspirator testimony. As we will explain, accomplices and co-conspirators are treated very differently in the law, a fact that Tull-Morales's counsel was obviously well aware, given that he separately argued for an accomplice testimony instruction and a co-conspirator testimony instruction at trial. Because Tull-Morales did not include the court's failure to instruct on accomplice testimony in his motion for new trial, he has waived this issue. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.").

Because he has waived this issue, Tull-Morales is not entitled to relief regarding the trial court's failure to give the accomplice testimony instruction unless he establishes plain error. The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not

necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

In considering these factors, we agree with the trial court's holding that even if Jobe joined the conspiracy near the end by assisting Jones in disposing of the alleged murder weapon, Jobe was not an accomplice because he could not have been indicted for the charged offenses of felony murder and especially aggravated robbery. As for whether Jones was an accomplice, we conclude that while Jones could have been considered Tull-Morales's accomplice if he had testified at trial, the record shows that Jones did not testify, and Jones's out-of-court statements properly came into evidence through Jobe's testimony pursuant to the co-conspirator exception to hearsay, as discussed in the previous section. See State v. Jack Price, No. E2011-01050-CCA-R3-CD, 2013 WL 5371679, at *11 (Tenn. Crim. App. Sept. 26, 2013), perm. app. denied (Tenn. Mar. 11, 2014) (stating that the court was aware of no cases applying the rule of law requiring corroboration of accomplice testimony when the accomplice did not testify at trial and the accomplice's out-of-court statements came in through the testimony of another witness); see also Alley, 968 S.W.2d at 317 (noting that "our supreme court continues to allow the admission of co-conspirator statements in criminal cases, viewing sufficient reliability to exist when a preponderance of the evidence shows that the conspiracy exists and that the statement was made by a co-conspirator during the course of and in furtherance of that conspiracy"). In any event, the State provided sufficient evidence corroborating Jobe's testimony and Jones's out-of-court statements that Tull-Morales participated in the especially aggravated robbery and felony murder of the victim. Specifically, the State presented the recorded telephone conversation in which Tull-Morales admitted he shot the victim. The State also presented testimony from Pinson, who stated that Tull-Morales told her "that he was going to rob somebody," that he later returned to her home, covered in blood, with money and drugs in his possession, that he admitted to shooting the victim, and that he acknowledged his participation in the offenses when he saw a news story on television about the victim's death. For these reasons, Tull-Morales has failed to establish that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the error was necessary to do substantial justice. Because Tull-Morales failed to establish all five factors required for plain error, he is not entitled to relief on this issue. See Smith, 24 S.W.3d at 282.

Alternatively, Tull-Morales asserts that Jones was a co-conspirator and that Jobe became a co-conspirator near the end of the conspiracy and that although he requested the trial court to instruct the jury that he could not be convicted on the uncorroborated testimony of a co-conspirator, the trial court denied his request. He then argues, unconvincingly, that an instruction for co-conspirator testimony is the same as an instruction for accomplice testimony because "a defendant cannot be convicted on the

-24-

uncorroborated testimony of a co-conspirator." He asserts, without citation to authority, that "an accomplice is always a co-conspirator and a co-conspirator is always an accomplice" and that the "definitions of a conspirator and an accomplice are almost identical." Initially, we note that despite Tull-Morales's claims to the contrary, Tennessee law does not equate an accomplice with a co-conspirator. Compare Collier, 411 S.W.3d at 894 (An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime."), and Lawson, 794 S.W.2d at 369 (The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged.), with Carruthers, 35 S.W.3d at 555 ("A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means."), and T.C.A. § 39-12-103(a) ("The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense."). Moreover, although there are pattern jury instructions for accomplice testimony, there is no pattern jury instruction regarding co-conspirator testimony. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.09, 42.09(a) (16th ed. 2012). The only pattern jury instruction regarding conspiracy is the instruction for the offense of criminal conspiracy found in Tennessee Pattern Jury Instruction 4.03, and Tull-Morales concedes that the trial court properly held that conspiracy was not a lesser included offense of felony murder or especially aggravated robbery. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 4.03 (16th ed. 2012).

For these reasons, any instruction regarding the statements of a co-conspirator would have been in the nature of a special jury instruction. See James, 315 S.W.3d at 446 (stating that there is no requirement that a trial court be limited to using pattern jury instructions); State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001) (asserting that special instructions are given "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury.").

A review of the record shows that although Tull-Morales orally requested a jury instruction on co-conspirator testimony, he did not file a written request for a special jury instruction on this issue, as is required, and, therefore, has waived this issue. See Tenn. R. Crim. P. 30(a); State v. Leath, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013) (stating that the defendant's failure to file a written request for a special jury instruction on her "theory of defense" resulted in waiver); State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (holding that Rule 30(a) "envisions that such requests be made in writing" and that because the request for a special instruction was not made in writing, the trial court did not err in refusing to instruct the jury on the special instruction on

-25-

intoxication).  Interestingly, Tull-Morales has never provided the specific language for an instruction requiring that a co-conspirator's testimony be corroborated, choosing instead to equate an instruction on co-conspirator's testimony with an instruction on accomplice testimony, which we have already held is improper.  Because Tull-Morales has failed to establish that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the error was necessary to do substantial justice, he is also not entitled to plain error relief on this issue.

        **III.  <u>Sufficiency of the Evidence.</u>**  Finally, Tull-Morales contends the evidence is insufficient to sustain his convictions for first degree felony murder and especially aggravated robbery.  The State counters that the evidence, when viewed in the light most favorable to the State, is sufficient to support the jury's verdicts.

        "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009) (citing <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992)).  When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  <u>State v. Parker</u>, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)); <u>see</u> Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  <u>State v. Davis</u>, 354 S.W.3d 718, 729 (Tenn. 2011) (citing <u>State v. Majors</u>, 318 S.W.3d 850, 857 (Tenn. 2010)).

        Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  <u>State v. Sutton</u>, 166 S.W.3d 686, 691 (Tenn. 2005); <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>Hanson</u>, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  <u>State v. Campbell</u>, 245 S.W.3d 331, 335 (Tenn. 2008) (citing <u>Byrge v. State</u>, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.  <u>Dorantes</u>, 331 S.W.3d at 379 (citing <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact.  <u>Id.</u>

In this case, Tull-Morales was convicted as charged of first degree felony murder and especially aggravated robbery. As relevant in this case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (Supp. 2011). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. Id. § 39-13-202(b) (Supp. 2011). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Especially aggravated robbery is robbery, as defined in Code section 39-13-401, which is accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. §§ 39-13-401, -403.

A defendant may be convicted of a crime as a principal actor or pursuant to the theory of criminal responsibility. As relevant in this case, an individual is criminally responsible for an offense committed by the conduct of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2). Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). "[D]efendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008) (citing State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997)).

Under the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred." State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293). Nevertheless, in order to be convicted under a theory of criminal responsibility, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

First, Tull-Morales claims that the State failed to prove beyond a reasonable doubt his identity as one of the perpetrators in this case. He asserts that other than Iris Pinson's testimony, which he claims was "incredible," there was no evidence placing him at the crime scene. He notes that while Pinson testified that Tull-Morales told her, "I blew his

face off," the police and Dr. Deering, the medical examiner, testified that the victim was not shot in the face. In addition, he states that while Pinson testified that Tull-Morales's shirt was "saturated in blood," Dr. Deering testified that there was an absence of blood at the crime scene because the victim's blood filled his chest cavity rather than flowing outside his body. Finally, Tull-Morales notes that when Dr. Deering was asked about the likelihood of the shooter's shirt being saturated with blood given the absence of blood outside the victim's body, Dr. Deering replied that he did not know how someone else's shirt could be saturated with the victim's blood. Tull-Morales asserts that Pinson's unbelievable testimony, when coupled with the absence of forensic evidence placing him at the crime scene and the fact that he did not speak English, makes his conviction "even more ludicrous."

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

The proof, when viewed in the light most favorable to the State, was sufficient to establish Tull-Morales's identity as a perpetrator of the charged offenses. Although he claims that Pinson's testimony was the only evidence placing him at the crime scene, he fails to acknowledge the recorded telephone conversation, played for the jury, in which he admits that he shot the victim in the face. He also fails to acknowledge Jobe's and Pinson's testimony connecting him to the crimes. Jobe testified that Jones came to his home, informed him that "he had his little G's with him," referencing Tull-Morales and Conde-Valentino in the backseat of his SUV, and told him that "they [were] fixing to rob" the victim. Pinson testified that Tull-Morales informed her "that he was going to rob somebody," that he later returned to her home, covered in blood, with money and drugs in his possession, that he admitted to shooting the victim, and that he acknowledged his participation in the offenses against the victim after seeing a news story on television. Although Tull-Morales claims that Pinson's testimony was inconsistent with other evidence presented at trial, the jury determined the credibility of each of the witnesses' testimony and resolved all conflicts in the evidence in the State's favor. See Campbell, 245 S.W.3d at 335. For these reasons, Tull-Morales is not entitled to relief on this issue.

Second, Tull-Morales argues there was no evidence showing that a robbery occurred, asserting that if the proof is insufficient as to the especially aggravated robbery offense, then the proof is "automatically insufficient" as to the felony murder offense. He claims that only the "uncorroborated statements" of Jones and the "double hearsay statements of Jobe," for which the jury did not receive proper instructions, established that a robbery occurred in this case. He also claims that Pinson's testimony failed to establish a robbery offense because she testified only that "somebody" was going to be robbed. Although Pinson testified that the three defendants returned to her home with drugs and money, Tull-Morales argues that this evidence does not mean that the drugs and money came from the victim, especially given that the police found drugs and money at the victim's house after he was killed. He also claims that no witnesses identified with particularity that any drugs or money belonged to the victim.

We have already held that Jones's statements, as testified to by Jobe, were admissible pursuant to the hearsay exception for co-conspirator statements and that the trial court did not err in refusing to instruct the jury as to accomplice testimony and co-conspirator testimony. Jones's statements establish that the victim was killed during a robbery in which he, Conde-Valentino, and Tull-Morales participated. Pinson testified that Jones, Conde-Valentino, and Tull-Morales informed her that they were going to rob someone. She said that hours later, Jones, Conde-Valentino, and Tull-Morales returned to her home, covered in blood, with drugs and money. Pinson recalled that Conde-Valentino and Tull-Morales were angry because they felt they did not receive their fair share of the drugs and money recovered during the robbery. Therefore, we conclude that the proof presented at trial was more than sufficient to show that a robbery involving the victim took place.

Viewing the proof in the light most favorable to the State, a rational jury could have found Tull-Morales guilty of the offenses in this case based on his own conduct or the conduct of Jones or Conde-Valentino, for which Tull-Morales was criminally responsible. Tull-Morales admitted that he shot the victim in the recorded telephone conversation played for the jury. Jones's statements, which were admissible as statements of a co-conspirator, show that Tull-Morales participated in the robbery. Pinson's testimony established that Tull-Morales admitted that he had shot the victim and shared in the proceeds from the robbery. Because the proof presented at trial is sufficient to sustain Tull-Morales's conviction for especially aggravated robbery and for felony murder based upon that robbery, we conclude he is not entitled to relief.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE