IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2016

**STATE OF TENNESSEE v. ZACHARY DAVID STRICKLAND**

**Appeal from the Circuit Court for Bedford County**
**No. 17994     Forest A. Durard, Jr., Judge**

_____

**No. M2015-02118-CCA-R3-CD – Filed September 22, 2016**

_____

Defendant, Zachary David Strickland, was convicted of initiation of a process intended to result in the manufacture of methamphetamine and sentenced to ten years of incarceration. After the denial of a motion for new trial, Defendant filed an untimely notice of appeal. In the interests of justice, we waive the timely filing of the notice of appeal. However, upon review of the evidence presented at trial, we determine that the evidence was sufficient to support the conviction. Consequently, the judgment of the circuit court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Christopher P. Westmoreland, Shelbyville, Tennessee, for the appellant, Zachary David Strickland.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted in December of 2014 for initiation of a process intended to result in the manufacture of methamphetamine, in violation of Tennessee Code Annotated section 39-17-435. The charges arose after Deputy Garcia Jordan of the Bedford County Sheriff's Department went to the home of Teresa Lawson Leverette to

speak with Defendant about an active warrant out of Rutherford County. Sergeant Kevin Roddy and Lieutenant Nikia Elliott met Deputy Jordan at the mobile home.

Deputy Jordan knocked on the door but did not get an immediate response. After continuing to knock and to call out Ms. Leverette's name, she eventually came to the door. Deputy Jordan asked if Defendant was at the residence and Ms. Leverette did not respond "right away." Ms. Leverette eventually allowed Deputy Jordan and Sergeant Roddy to enter the residence. Ms. Leverette "pointed to the back bedroom of the residence." Defendant "was not actually in the bedroom, he was in the bathroom" which was accessible through the bedroom of the home. Lieutenant Elliot remained outside the residence until Defendant was located so that she could monitor the entrances and exits to the home.

Once Defendant was located, the officers accompanied him to the living room of the home. Deputy Jordan noticed "two cut straws that were laying on the coffee table in an ashtray." He described these items as "something that's used quite frequently in narcotics." After a discussion with the officers, Ms. Leverette gave permission to search the residence.

Officers searched the kitchen first. There, they found "a computer that had been taken apart, the battery from the computer had been pretty much disassembled." Ms. Leverette indicated that there may be something in the closet of the back bedroom. Lieutenant Elliot described the room as a "junk room." Officers found a "panel that at one time had been screwed into the wall" that was "partially hanging off." Inside the wall there was a blue bag. Inside you could "clearly see the top of a Gatorade bottle sticking out of the bag." Lieutenant Elliot described the bottle as a "one pot [meth] lab" because she also saw residue on the bottle, a coffee filter, and piece of tubing inside the bottle consistent with meth labs she had seen previously. Officers removed the bag containing the bottle from the home because they were afraid that it would explode. Officers eventually recovered seven one-pot meth labs from the closet of the residence.

Officers searched the kitchen again after the discovery of the items in the closet. Remnants of another meth lab were found in the kitchen along with "ingredients" or "precursors that would be involved in [making meth]," including muratic acid, lye, aluminum foil, plastic tubing, fuel containers, coffee filters, empty packages of pseudoephedrine, and a receipt from Kroger for the purchase of pseudoephedrine. Officers were able to trace the purchase of pseudoephedrine to Defendant using surveillance video of the purchase. Officers also found a red "Sharpies container for needles, where you dispose needles."

Defendant admitted to Lieutenant Elliot that he had been "staying" at the home for a few days and that he "had been a meth user for about ten years," preferring the injection

of meth. Defendant also told Lieutenant Elliot that he "had never seen anything in the home that would have led him to believe that there was . . . any meth being produced there."

Ms. Leverette indicated that Defendant had been at the house for "a couple of weeks" and that he typically slept in her bed. Ms. Leverette testified that she allowed Defendant to make methamphetamine in her home and that she witnessed "segments" of the process. However, because of the way the "really loud smell" affected her "COPD," she stayed in the front of the house while Defendant made methamphetamine at the back of the house. Sometimes, Defendant was assisted by his ex-girlfriend, Angie Zwarton. No one stayed in the back bedroom where the methamphetamine was made because of bedbugs. Occasionally, she would assist Defendant by taking the "Sudafed out of the blister packs, crush[ing] it up for him a time or two, sitting on the couch, you know, the pills or whatever." She identified "shake bottles" recovered from the house and described how they were used in the process of making methamphetamine. She recalled seeing Defendant walk around the house shaking the bottles to activate the ingredients inside but she did not recall seeing Defendant measure ingredients to go into the bottles. In exchange for allowing Defendant to use her house, she got "free dope."

At the time of his arrest, Defendant was not in possession of any methamphetamine. Ms. Leverette testified that it was not unusual for there to be no methamphetamine in the house. At the time, both she and Defendant were "IV drug users . . . doing very large doses." She explained that serious addicts "want to keep up that same amount of high" or "try to get a larger high, a bigger high." When they ran out they "found a way to get more." Ms. Leverette testified that she pled guilty to initiating a process to manufacture methamphetamine and did not get a deal to testify against Defendant.

Chad Webster, a detective with the Bedford County Sheriff's Department was called to the scene. When he arrived, he put on a hazard suit and mask. He identified the bottles found in the closet as consistent with one pot methamphetamine processing labs. Detective Webster took the bottles outside and laid them on the ground. Detective Webster observed other components of methamphetamine production in the mobile home including aluminum foil and "empty containers for the cold packs, which actually contained ammonium nitrate." He explained that ammonium nitrate is used in the production of methamphetamine in the "one pot meth lab" cooking method.

Shane George, a member of the Shelbyville Police Department and 17th Judicial Drug Task Force observed and reviewed the items that were taken from Ms. Leverette's residence. In his opinion "obviously there was meth production that was taking place." He explained that pseudoephedrine was the "precursor" used in the items taken from the house and that, when combined with "other agents and reagents," including lighter fluid

and cold packs, it "affect[ed] the chemical change on that pseudoephedrine." In making methamphetamine, "you're taking the precursor, the pseudoephedrine, the petroleum-based product, the ammonium nitrate. Next [you] would be [combining those with] the sodium hydroxide or the drain cleaner." Agent George explained that you combined all those items with the "lithium out of the lithium battery" and a little bit of water. He noted that it was common to use a "drink bottle" as the "reactionary vessel." The water reacts with the lithium and the entire concoction "starts bubbling and rolling" and it is "pretty violent inside the bottle." The "cook" has to monitor the reaction and "burp" the bottle by allowing gases inside the bottle to escape so that too much pressure does not build up inside the bottle and blow up. Once the reaction "tapers out," the cook has to convert the mixture into a solid by pouring "muratic acid" into another bottle and adding "strips of aluminum foil." This process creates hydrochloric gas. Coffee filters are used to separate the meth oil into another container that is usually made of glass. Then, the hydrochloric gas is introduced to the meth oil by the using plastic tubing. When the meth oil and the hydrochloric gas mix, the meth crystalizes and falls to the bottom of the glass container. Once that step is finished, the coffee filters are again used to separate the finished meth from the petroleum product by drying or heating it. According to Agent George, "almost every part of the step . . . was present in Ms. [Leverette's] house." In his experience, the "components that were located inside the house . . . clearly spell[ed] out meth cook."

The jury found Defendant guilty as charged in the indictment. The trial court sentenced Defendant to ten years in incarceration. Defendant filed a timely motion for new trial, which the trial court denied. Defendant filed an untimely notice of appeal.

*Analysis*

*Notice of Appeal*

At the outset, the State argues that because Defendant's notice of appeal was untimely and because he has provided no excuse justifying waiver of the timeliness of the motion, all of his arguments on appeal are waived. Defendant does not address this issue.

Under Tennessee Rule of Appellate Procedure 4(a), the notice of appeal must be filed "within 30 days after the date of entry of the judgment appealed from." However, Rule 4(a) also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a).

Our review of the record reveals that the trial court denied the motion for new trial on September 21, 2015. Defendant had thirty days after the date of entry of that judgment to file a notice of appeal. In other words, Defendant had until October 21,

2015, to file the notice of appeal. The notice of appeal was filed by Defendant on October 27, 2015, six days late. Although Defendant has not requested this Court waive the untimely notice of appeal nor explained the late-filing of the notice of appeal, we nevertheless will consider the issue raised by Defendant in the interest of justice.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence on the basis that the only evidence offered by the State connecting him to the methamphetamine was the uncorroborated testimony of Ms. Leverette and that he was never in possession of anything illegal. Further, Defendant insists that the State failed to prove that a "commercial product was modified pursuant to the statutory requirement to support a conviction of Initiation of a Process to Manufacture Methamphetamine." The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Tennessee Code Annotated section 39-17-435 provides the elements of the offense of initiation of a process intended to result in the manufacture of methamphetamine:

(a) It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine.

(b) It shall not be a defense to a violation of this section that the chemical reaction is not complete, that no methamphetamine was actually created, or that the process would not actually create methamphetamine if completed.

(c) For purposes of this section, "initiates" means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation.

Possession, in Tennessee, may be actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Additionally, one may be in possession (of an item) alone or jointly with others. *State v. Copeland*, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). Constructive possession means to have "the power and intention at a given time to exercise dominion and control over [the contraband] either directly or through others." *Shaw*, 375 S.W.3d at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). This Court has stated, however, that "[t]he mere presence of a person in an area where drugs are discovered is not, alone, sufficient." *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000) (citing *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987)). "Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs." *Cooper*, 736 S.W.2d at 129.

Of course, a criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). This principle has been described as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).

Viewed in a light most favorable to the State, the proof at trial established that Defendant had been living at the mobile home of Ms. Leverette for about two weeks. When officers came to the residence to execute a warrant, Defendant was found in the bathroom adjacent to the bedroom where seven "one-pot meth labs" were found in a panel in the wall. Ms. Leverette testified that she allowed Defendant to make methamphetamine in her home in exchange for free drugs. Various items used in the manufacture of methamphetamine were found in the mobile home including: lye, muratic acid, coffee filters, plastic tubing, aluminum foil, and empty pseudoephedrine blister packs. Officers located used needles in a "Sharpies" container and two cut straws used, according to Ms. Leverette, for snorting methamphetamine. In the trashcan of the mobile home, police recovered a receipt from Kroger for pseudoephedrine, purchased three days prior to the search of the residence. A review of the surveillance video from Kroger showed that Defendant purchased the pseudoephedrine. Further, empty pseudoephedrine blister packs were found in the trash along with at least one "meth lab." Finally, Defendant admitted to officers that he used methamphetamine and that he preferred to inject the drug. These facts were sufficient for the jury to determine that Defendant initiated a process to make methamphetamine. The evidence that Defendant purchased the pseudoephedrine provided corroboration to Ms. Leverette's testimony. Moreover, Defendant, by living in the house and admitting to using methamphetamine, could have been deemed to have constructively possessed the items in the house used to make the methamphetamine.

To the extent that Defendant argues that the evidence is somehow insufficient because the trial court failed to provide a definition for "commercial product" in its instruction to the jury, we note that Defendant failed to object to the jury instructions as given by the trial court at trial. Thus, any issue with regard to the jury instructions is waived. *See State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (finding that a Defendant waives the right to object to merely incomplete, as opposed to erroneous or inaccurate, jury instructions if not raised at trial). Defendant does not provide the allegedly proper definition of "commercial product" that should have been submitted to the jury. Our review of the jury instructions reveals that the trial court instructed the jury with language that mirrored the statute defining the offense for which Defendant was on trial. Moreover, the jury heard Agent George testify at length regarding the process by which

methamphetamine is manufactured, including an explanation that the pseudoephedrine was the key ingredient in the production of methamphetamine. Additionally, Ms. Leverette testified that she helped Defendant on several occasions by taking Sudafed out of the blister packs and crushing the pills. We determine that it was entirely reasonable for the jury to conclude that Defendant had initiated the process for "extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE